IN THE COMMONWEALTH COURT OF PENNSYLVANIA

IN RE: Senior Health Insurance     :
Company of Pennsylvania            :
In Rehabilitation                  :     No. 1 SHP 2020


RE: Application for Approval of the Plan of Rehabilitation for Senior Health
    Insurance Company of Pennsylvania


BEFORE:  HONORABLE MARY HANNAH LEAVITT, Judge


                                   FILED: August 24, 2021


**<u>OPINION AND ORDER</u>**

**TABLE OF CONTENTS**

| | | Page |
|---|---|---|
| I. | Introduction …………………………………………….. | 1 |
| II. | Findings of Fact ……………………………………… | 2 |
| | A. Business and History of SHIP ………………………….. | 2 |
| | B. SHIP's Financial Condition …………………………….. | 4 |
| | C. Rehabilitation Plan …………………………………….. | 5 |
| | D. Hearing on Second Amended Plan …………………….. | 10 |
| |    i. Rehabilitator's Evidence ……………………….. | 11 |
| |       a. Patrick Cantilo…………………………… | 11 |
| |       b. Marc Lambright ……………………….. | 26 |
| |       c. Vincent Bodnar ………………………... | 27 |
| |    ii. Intervening Regulators' Evidence ………………… | 31 |
| |       a. Frank Edwards ……………………….…… | 31 |
| |    iii. Intervenor NOLHGA's Evidence ………………… | 33 |
| |       a. Peter Gallanis ……………………………….. | 33 |
| |       b. Matthew Morton ……………………………. | 35 |
| |    iv. Intervening Agents and Brokers' Evidence ………….. | 37 |
| |       a. Daniel Schmedlen ……………………………... | 37 |
| |    v. Intervening Health Insurers' Evidence ……………… | 39 |
| |    vi. Intervening Policyholders' Evidence ………………… | 39 |
| |       a. James Lapinski ……………………………….… | 39 |
| |       b. Rose Marie Knight ……………………………... | 40 |
| III. | Standard of Review …………………………………….. | 41 |
| IV. | Legal Analysis ………………………………………...... | 42 |
| | A. The Second Amended Plan Serves a Rehabilitative Purpose and is within the Discretion of the Rehabilitator…… | 42 |
| |    1. Goals of the Plan ………………………………... | 42 |
| |    2. No Contrary Evidence ………………………………... | 44 |
| | B. The Goals of the Plan Could Not be Achieved in Liquidation ……………………………………………….. | 44 |
| |    1. Liquidation Will Not Address the Funding Gap ……... | 45 |
| |    2. Liquidation Will Perpetuate the Inequitable Premium Rate Structure ………………………………… | 45 |
| |    3. Liquidation Involves Inherent Delays ………………... | 46 |

4. Policyholders Will Have Fewer Choices in Liquidation ………………………………… 48

C. The Plan Meets the Legal Standards for Confirmation ……... 48

    1. The Plan's Rate Approval Mechanism and Issue-State Rate Approval Alternative are Permissible Under Pennsylvania Law and the United States Constitution ………………………………………... 48

    2. The Plan Satisfies all Constitutional Requirements ….. 61

      i. The Plan Satisfies Pennsylvania's Interpretation of *Carpenter* …………………………………. 62

      ii. The Intervening Regulators' Interpretation of *Carpenter* is Flawed ……………………………. 64

    3. The Plan is Feasible to the Extent Required by Pennsylvania Law …………………………………. 65

    4. The Plan is Fair and Equitable ……………………….. 68

D. Other Concerns and Objections Raised at the Hearing are Overruled or Have been Adequately Addressed ……………. 69

    1. Intervening Regulators' Application for Reconsideration …………………………………… 69

    2. Policy Restructuring ……………………………….. 75

    3. Policyholder Communications ………………………. 75

    4. COVID-19 Pandemic ……………………………… 76

    5. Funding Gap and SHIP's Balance Sheet ……………... 77

    6. Timing ……………………………………………... 77

V. Conclusions of Law ………………………………………….. 78

VI. Conclusion ………………………………………………… 79

## I. Introduction

Before the Court is the application of Jessica K. Altman, Pennsylvania Insurance Commissioner, which she filed in her capacity as Statutory Rehabilitator of Senior Health Insurance Company of Pennsylvania (SHIP). By this application, the Rehabilitator seeks approval of her Second Amended Plan of Rehabilitation (Second Amended Plan or Plan) for SHIP pursuant to Section 516(d) of Article V of The Insurance Department Act of 1921 (Article V), Act of May 17, 1921, P.L. 789, *added by* the Act of December 14, 1977, P.L. 280, 40 P.S. §221.16(d). The Rehabilitator has the statutory responsibility to develop a plan to correct the conditions that caused SHIP's hazardous financial condition. Giving deference to the Rehabilitator's discretion in formulating this Plan, this Court must decide whether to approve the Plan, approve the Plan with modifications, or disapprove the Plan.

At present, SHIP has approximately $1.4 billion in assets and $2.6 billion in liabilities, producing a deficit of approximately $1.2 billion (also referred to as the Funding Gap). The Second Amended Plan's ultimate goal is to eliminate the Funding Gap by increasing premium revenue and modifying the existing terms of most of the approximately 39,000 policies in force. The Plan is structured to maximize policyholder choice in several ways. Depending on his circumstances and preferences, a policyholder may choose to continue his policy with all benefits and terms unchanged by paying the actuarially justified annual premium for that policy. Alternatively, the policyholder may choose to reduce some policy coverages as more suitable to the policyholder's current circumstances in order to avoid or temper a premium increase. A policyholder who is 95, for example, may decide to reduce the

maximum coverage period from 10 to 5 years in lieu of paying the premium required for a policy with a 10-year period of coverage.

The Second Amended Plan also seeks to correct SHIP's discriminatory premium rate structure. At present, SHIP policyholders pay substantially different premiums for the same coverages. The difference in premiums is attributed to the decisions of different state regulators on SHIP's proposed rate increases. The state where the policy is issued retains authority for all rate increases, even after the policyholder moves to another state. Policyholders whose state of issue has approved the requested rate increase pay more for the same coverages than policyholders whose state of issue has disapproved the requested rate increase. As a result, the former group of policyholders pays more than its fair share of the costs of providing the coverages and the latter group pays less than its fair share. The Second Amended Plan seeks to eliminate these inequities.

The Court conducted a hearing on the Second Amended Plan from May 17, 2021, through May 21, 2021. The parties submitted post-hearing briefs on June 21, 2021, and June 28, 2021. On July 21, 2021, the Rehabilitator and Intervening Agents and Brokers filed an application for the Court's approval of a settlement agreement, which will amend Part VI.N of the Plan. The Rehabilitator's application for approval of the Second Amended Plan is ready for disposition, with the exception of Part VI.N, on which a decision will be deferred for 30 days to allow a hearing on the Rehabilitator's settlement agreement with the Intervening Agents and Brokers.

## II. Findings of Fact

### A. Business and History of SHIP

SHIP is a Pennsylvania life and health insurance company. Its origins date to 1887, when its corporate predecessor, the Home Beneficial Society,

commenced business. By the 1980s, the company was known as American Travelers Insurance Company and was primarily writing long-term care insurance. In 1996, the company was acquired by, and merged into, CIHC, Inc., a wholly-owned subsidiary of Conseco, Inc., and renamed Conseco Senior Health Insurance Company. In 2002, Conseco, Inc. filed a petition for reorganization under Chapter 11 of the United States Bankruptcy Code.[1] In 2003, Conseco, Inc. emerged from bankruptcy as CNO Financial Group. In 2003, Conseco Senior Health Insurance Company ceased writing long-term care insurance and limited its operations to the administration and servicing of existing policies. In October 2008, Conseco Senior Health Insurance Company changed its name to Senior Health Insurance Company of Pennsylvania (SHIP), and its ownership was transferred from CNO Financial Group to the newly-formed nonprofit Senior Health Care Oversight Trust, which has managed the run-off of SHIP's long-term care insurance business since 2008.

SHIP was licensed in 46 states (excluding Connecticut, New York, Rhode Island, and Vermont), the District of Columbia, and the U.S. Virgin Islands. Through its predecessors, SHIP issued approximately 645,000 long-term care policies; as of December 31, 2020, 39,148 policies remained in force. Exhibit (Ex.) RP-33 at 3.[2] SHIP's policies cover long-term care services provided in congregant settings, such as nursing homes and assisted living facilities, as well as home-based health care services and adult day care. The states with the greatest number of SHIP

---

[1] 11 U.S.C. §§101-1532.

[2] As of the date of the hearing on the Plan, SHIP had approximately 45,000 policies in force that are not long-term care policies. These policies are not material to the Second Amended Plan or the proposed rehabilitation of SHIP; they do not consume SHIP resources, either because they are reinsured or because claims under those policies are paid through a trust which is adequately funded.

long-term care policies in force as of December 31, 2020, are Texas with 4,960 policies; Florida with 4,040 policies; Pennsylvania with 3,862 policies; California with 3,183 policies; and Illinois with 1,753 policies. Ex. RP-22 at 2. By contrast, the three states represented by the intervening state regulators in this matter have comparatively fewer policies in force; as of year-end 2020, there were 316 policies in force in Maine, 296 in Massachusetts, and 1,287 in Washington. *Id*.

The average age of a SHIP long-term care policyholder is 86, and the average age of a policyholder on claim is 89. Only 53% of SHIP long-term care policyholders pay premium. This is because the remaining 47% of policyholders either are on premium waiver[3] or have previously taken a non-forfeiture option, which allows the policyholder to discontinue paying premiums in exchange for a period of coverage equal to the premiums previously paid to the company less any benefits previously received. Approximately 13% of SHIP's long-term care policyholders are on claim, and the Rehabilitator expects that number to rise to 32% of all policyholders by 2050. Ex. RP-56 at 21. The Rehabilitator also expects the volume of SHIP's claims to continue outpacing its premium collections. Specifically, in the absence of the Rehabilitator's plan, SHIP will pay another $3 billion in claims but collect only $230 million in premiums. *Id*. at 20.

### B. SHIP's Financial Condition

SHIP has approximately $1.4 billion in assets and $2.6 billion in liabilities, *i.e.,* a Funding Gap of $1.2 billion. Ex. RP-31 at 1-2. The major causes

---

[3] Approximately 99% of SHIP's long-term care policies provide that a policyholder who receives benefits under his policy for a specified period of time (such as 90 days) is no longer required to pay premiums for coverage after that time period as long as the policyholder remains eligible for benefits or receives a specified level of care. "Once the policyholder's eligibility for benefits ends, the policyholder is required to resume paying premiums." Ex. RP-55 at 86 (Second Amended Plan).

of SHIP's insolvency were the use of erroneous actuarial assumptions to develop initial premium rates, poor investment returns, high operating costs, and the inability to obtain the approval of actuarially justified rate increases from state insurance regulators. Two significant adverse events exacerbated SHIP's financial situation. In 2018, following the appointment of a Special Deputy Rehabilitator and a revision of SHIP's key actuarial assumptions, SHIP recorded a $374 million premium deficiency reserve; a $44 million increase in claim reserves; and a $176 million investment loss from the so-called Beechwood investment program. These accounting entries increased SHIP's 2018 deficit by $500 million. *See* Ex. RP-56 at 23. In 2019, revised actuarial assumptions required an increase in reserves, thereby adding another $400 million to SHIP's deficit. *Id*. SHIP's annual premium revenue as of December 31, 2020, is $58 million. *Id*. at 14.

### C. Rehabilitation Plan

Given SHIP's negative capital and surplus, the Insurance Department applied to this Court for an order placing SHIP in rehabilitation, with the consent of the Senior Health Care Oversight Trust and SHIP's directors. On January 29, 2020, the Court granted the application and appointed the Pennsylvania Insurance Commissioner to serve as Rehabilitator of SHIP; to take steps to address SHIP's financial challenges; and to protect its policyholders and other creditors.

The Rehabilitator engaged a Special Deputy Rehabilitator, Patrick Cantilo, and actuarial consultants, including Oliver Wyman, to study SHIP's financial condition and to manage the company while they developed corrective measures. On April 22, 2020, the Rehabilitator filed a plan for the rehabilitation of SHIP. The Court issued a case management order which, *inter alia*, solicited formal

and informal comments from any interested person.  Several intervened to offer comments on the rehabilitation plan and participate in any proceedings, including:[4]

1) The Maine Superintendent of Insurance, the Massachusetts Commissioner of Insurance, and the Washington Insurance Commissioner (Intervening Regulators);

2) The National Organization of Life and Health Guaranty Associations (NOLHGA);

3) ACSIA Long Term Care, Inc.; Global Commission Funding LLC; LifeCare Health Insurance Plans, Inc.; Senior Commission Funding LLC; Senior Health Care Insurance Services, Ltd., LLP; and United Insurance Group Agency, Inc. (Intervening Agents and Brokers);

4) Anthem, Inc.; Health Care Service Corporation; Horizon Health Care Services, Inc. d/b/a Horizon Blue Cross Blue Shield of New Jersey; and UnitedHealthcare Insurance Company (Intervening Health Insurers); and

5) James Lapinski, a policyholder and agent, and Georgianna Parisi, a policyholder.

After reviewing the formal and informal comments, the Rehabilitator filed an amended rehabilitation plan on October 21, 2020.  Following a second comment period and a pre-hearing conference, the Rehabilitator filed the Second Amended Plan on May 3, 2021.

The Second Amended Plan is designed to be implemented in three phases.  Phase One, beginning immediately upon Court approval, is the principal phase and seeks to reduce substantially or eliminate the Funding Gap.  This phase identifies the SHIP policies that require modification because their current premium

---

[4] The original intervening persons also included Transamerica Life Insurance Company and Primerica Life Insurance Company, both of which issued policies reinsured and administered by SHIP.  These parties are no longer actively participating in the proceeding.

falls below the "If Knew Premium" for the benefits provided by the policies. Ex. RP-55 at 10. The If Knew Premium rate is the rate that, if charged from inception, would have produced an underwriting loss ratio of 60% for each policy form. *Id*. at 27. If Knew Premium rates are intended to price policies adequately on a lifetime basis, but not to recoup losses due to inadequate pricing in the past. Further, the policyholder's age and current medical condition are not taken into account when setting the If Knew Premium rate. The If Knew Premium is an accepted methodology for setting premiums for long-term care insurance policies.

Policyholders whose current premium (including the premium they would be paying but for a premium waiver) falls below the If Knew Premium for the policy's benefits will be required to elect one of four options:

Option 1: continue paying the current premium or maintain the premium waiver if one is in effect, but if the current or waived premium is less than the If Knew Premium, have the policy benefits reduced in accordance with Plan provisions so that the premium for the reduced benefits (including waived premium) is equal (on an If Knew Premium basis) to the current premium. The benefit reductions will be selected automatically by the Plan.

Option 2: select certain policy endorsements that provide essential benefits (sometimes greater than the benefits provided by Option 1) for an actuarially justified premium. The maximum benefit period is capped at four years, the maximum daily benefit is capped at $300 and inflation protection is capped at 1.5%.

Option 2A: an enhanced alternative with a five-year benefit period and 2% inflation rider. Options 2 and 2A will not be subject to further rate increases or benefit reductions in Phase Two of the Plan. Options 2 and 2A are designed to provide reasonable coverage at reasonable premium rates.

Option 3: Non-forfeiture Option (NFO) through which the policyholder will receive a Reduced Paid-up (RPU) policy providing limited benefits but for which no future premiums will

7

be charged. Under the Plan, this option will include more generous benefits than the typical industry non-forfeiture option or reduced paid-up policy, most notably in that it will offer as much as a 30-month benefit period unless the current policy has a shorter benefit period. Moreover, policyholders who select this option will never have to pay additional premiums and this policy will never lapse.

Option 4: retain the current policy benefits and pay the corresponding If Knew Premium (unless equal to or lower than the policyholder's current premium). For many policyholders this may require a substantial increase in premium.

*See* Ex. RP-55 at 11-12. Policyholders who presently pay a premium at or above the If Knew Premium may elect Option 2 or Option 3 if preferable, given their present circumstances. Otherwise, these policyholders will not have their policies modified in any respect.

Before making an election, each policyholder will receive information detailing the premiums and benefits associated with each option. Special elections will apply to policyholders who are not currently paying premium due to a premium waiver provision in their or their spouses' policies. Most of these policyholders have a current premium (what they would be paying but for the waiver) that is lower than the If Knew Premium. These policyholders will be required to pay a differential premium, which represents the difference between (1) the premium they would be paying but for the premium waiver in effect (the current premium), and (2) the If Knew Premium appropriate for their policy coverages. Ex. RP-55 at 12. Should the premium waiver terminate, these policyholders will then be required to pay the full applicable If Knew Premium. Similar options will be offered to policyholders on claim.

8

For every policyholder there will be a default option that applies automatically if no election is made. For the policyholder whose current premium falls at or above the If Knew Premium, the default option leaves the policy unchanged. For the policyholder whose current premium falls below the If Knew Premium, the default option will be identified in the election materials. For policyholders on premium waiver, the default option will be Option 1 (the benefit downgrade). Where the nonforfeiture option would provide these policyholders better benefits than the downgrade, Option 3 will be the default option. For policyholders paying premium, Option 2 (basic policy endorsements) will be the default option.

In Phase Two of the Second Amended Plan, the results of Phase One will be evaluated to determine whether additional policy modifications may be necessary for certain policies that are still underpriced. It is expected that modifications in Phase Two will largely be based on achieving a self-sustaining premium for every policy. The goal of Phase Two will be to eliminate any Funding Gap not eliminated in Phase One. In Phase Three, the Rehabilitator will complete the run-off of SHIP's long-term care insurance business remaining in force.

The Second Amended Plan corrects the condition that caused SHIP's insolvency: the underpricing of policies. The Plan will address the Funding Gap by increasing premiums or modifying policy coverages. The Rehabilitator has concluded that a modification of coverages will do more to reduce the Funding Gap than premium increases. Further, many policyholders are paying for more coverage than they are likely to use.

The Rehabilitator designed the Plan around the core principle of policyholder choice. All policyholders will have at least one option for preserving

their current coverage (by paying an increased premium) and at least one option for preserving their current premium (by reducing policy benefits). The Plan's premium rate structure takes rate increase history and product differences into account, and it will develop premium rate increases based solely on the characteristics of each policy and not on the policyholder's state of residence or the state where the policy was issued.

The payment of commissions owed to agents under agreements made prior to the inception of rehabilitation proceedings will be suspended under the Second Amended Plan until policyholders' claims have been paid in full and adequate provision made for reasonably anticipated future claims. Accrual of commissions will also be suspended as of the effective date of the Plan, *i.e.,* the date the policyholder elections become effective. Claims for commissions owed to agents and brokers will be subordinated to policyholder claims. The Plan's treatment of agent and broker commissions reflects the Rehabilitator's belief that most policyholders do not maintain a close relationship with their agent after purchasing their policy. They typically contact SHIP or another trusted professional when they have questions about their policy.

### D. Hearing on Second Amended Plan

At the hearing on the Second Amended Plan, the Rehabilitator offered testimony from the following witnesses: Special Deputy Rehabilitator Patrick Cantilo, who was admitted as an expert in insurer insolvency matters, specifically as to long-term care insurers; Marc Lambright, an actuarial consultant to the Rehabilitator, who testified as a fact witness; and Vincent Bodnar, an actuarial consultant to the Rehabilitator, who was admitted as an actuarial expert and as an expert on long-term care insurance, including product development and sales

10

practices, the rate setting and approval process for insurers, and the liquidation of financially troubled insurers.

### i. Rehabilitator's Evidence

### a. Patrick Cantilo

Special Deputy Rehabilitator Patrick Cantilo provided the history of the business of SHIP, summarized above, and his involvement in the rehabilitation since 2018.

He first discussed the effects of the COVID-19 pandemic on SHIP's business and financial condition. Cantilo testified that since the beginning of the pandemic in 2020, SHIP has experienced a moderate increase in mortality, *i.e.*, more of its insureds died than would normally be expected, which generated a moderate increase in policy lapses. There was a small increase in morbidity, *i.e.*, the expected incidence of disease. The pandemic adversely affected SHIP's expected yield on invested assets. Cantilo opined that the aggregate effects of the pandemic had a relatively moderate impact on SHIP's financial condition and are not material to the Second Amended Plan.

Cantilo focused his testimony on the approximately 39,000 long-term care policies of SHIP. Approximately 53% of SHIP's current policyholders are paying premium, generating $58 million in revenue as of year-end 2020. The remaining 47% of policyholders are on claim, have previously selected a non-forfeiture option or are on premium waiver. *See* Ex. RP-56 at 14. Many policyholders have been paying less premium than is necessary to fund their coverages, and this premium deficiency has existed for years. SHIP policies that create the greatest liability have a 5% compounded inflation rider; unlimited lifetime benefits; and are non-tax qualified, meaning that they have lower benefit triggers

11

and shorter elimination periods. The effect of the inflation rider has been to increase the maximum daily benefit up to $650, without regard to actual inflation levels or the actual cost of the policyholder's care. Cantilo testified that the inflation rider is a "big contributor" to SHIP's overall deficit. Notes of Testimony (N.T.), 5/17/2021, at 34.

Cantilo testified that the majority of policyholders pay an annual premium of less than $2,500 per year. N.T., 5/17/2021, at 37-38. *See* Ex. RP-56 at 14. The group is 71% female, and the majority are in their 80s and 90s. Approximately 70% of the policies in force provide comprehensive coverage for both home health care and facility care in either an assisted living facility or nursing home. Inflation protection is a feature of 47% of these policies. The majority of policies, 54%, provide between one and four years of benefits; 27% provide lifetime benefits. Ex. RP-56 at 17.

Cantilo opined that SHIP's claims, when compared to premiums, do not present "a good picture." N.T., 5/17/2021, at 41. The number of policies in force has declined since SHIP began operating in 2009, and at present, the claim costs outpace the premium revenue. Of the total premium revenue that SHIP is expected to collect prior to the expiration of the policies in force, approximately $7.4 billion, it has already collected $7.1 billion. Stated otherwise, SHIP expects to collect only about $300 million in additional premium. On the other hand, SHIP's expected claims during that same period total approximately $11 billion; it has paid only $7.7 billion so far. In short, SHIP can expect to pay another $3 billion in claims but to collect only $300 million in premium, unless its business is restructured in a rehabilitation.

12

Cantilo testified that SHIP is not atypical in the industry. Long-term care insurers collect more premium than needed in the early years of writing policies. They invest the excess, put it aside, and then tap into those invested assets to pay claims. When a company stops writing new business, as SHIP did 18 years ago, the premium curve begins to flatten and the claim curve begins to rise. Cantilo testified that the assets set aside for the purpose of paying claims did not earn the expected income that was needed to meet liabilities.

Cantilo discussed the reasons for SHIP's insolvency, beginning with the erroneous actuarial assumptions made when the policies were first issued. SHIP underestimated the number of people who would become ill and qualify for benefits. At the same time, SHIP overestimated how quickly people would recover and stop needing care, referred to in the industry as morbidity improvement. SHIP overstated mortality by assuming more people would die before submitting claims than actually did. Relatedly, SHIP overestimated the number of policies that would lapse by reason of death or non-payment of premium. Cantilo estimated that through 2040, when most of the block of business will have terminated, the aggregate effect of the erroneous actuarial assumptions approximately equals the total deficit of $1.2 billion. *See* Ex. RP-56 at 29.

Another factor in SHIP's insolvency is its investment history. SHIP experienced lower market yields than it anticipated while it was selling and pricing its long-term care policies. To counter the effects of economic conditions, in 2009, SHIP invested in two programs, the Beechwood program and Roebling Re. Instead, these programs produced investment losses between $150 million and $300 million (as reported in 2018).

Cantilo testified that a significant cause of SHIP's insolvency is its discriminatory premium rate structure. As SHIP management realized its premium rates were inadequate, it began seeking premium rate increases from state regulators across the country from 2009 to 2021. SHIP received wildly different rate approvals. *See* Ex. RP-56 at 45. Cantilo testified that from 2009 to 2019, SHIP lost $312 million in cumulative premium due to rejected rate increase filings, or $371 million using an assumed 3.5% interest rate of return on investments. N.T., 5/17/2021, at 63-64; Ex. RP-56 at 50-51. The different responses of state regulators to SHIP's requested rate increases have created a discriminatory rate structure, which has been the focus of criticism in the regulatory community. Policyholders whose state of issue has approved rate increases are effectively subsidizing policyholders whose state of issue has not approved rate increases. Similarly situated policyholders are paying vastly different premiums for the same coverage. Cantilo opined that this has created an unfortunate side effect: states inclined to approve actuarially justified rate increase requests become hesitant to do so because of the failure of other states to act in kind.

The Rehabilitator's team had to decide whether to pursue a rehabilitation or liquidation of SHIP. Cantilo testified that the team chose rehabilitation because SHIP is financially able to provide a reasonable package of coverages to the remaining 39,000 policyholders. The Rehabilitator also considered that, in a liquidation, guaranty association coverage will be triggered, resulting in taxpayers contributing hundreds of millions of dollars to pay claims of policyholders who have not paid an appropriate premium. Rather than shifting the burden of the inadequate premium to taxpayers, the team concluded that the better course was to right-size the existing policies to an actuarially justified premium. Acknowledging

that no rehabilitation plan will magically restore SHIP to solvency, Cantilo testified the Second Amended Plan will, at a minimum, substantially reduce the Funding Gap and correct SHIP's inequitable premium rate structure. He explained that the Plan must be implemented quickly because of the advanced age of the policyholders.

In preparing the Second Amended Plan, the Rehabilitator relied on the combined expertise of Cantilo; Vincent Bodnar and other actuarial analysts at Oliver Wyman; Robert Robinson, who was appointed Chief Rehabilitation Officer of SHIP and who served as Chief Rehabilitation Officer and Chief Liquidation Officer for Penn Treaty;[5] Pennsylvania Insurance Department legal counsel and staff; and SHIP technical staff. The Rehabilitator also sought and considered the input of state insurance regulators, staff of the National Association of Insurance Commissioners, policyholders and other formal and informal commenters. The Rehabilitator's team prepared extensive analyses of SHIP's finances, its policyholders, the long-term care insurance market, and other matters relevant to SHIP's condition and prospects for rehabilitation. Key data and information have been made available to interested persons through a data site, which included actuarial files relating to assumptions and analyses, a seriatim actuarial file for every policy at issue, and tailored reports related to the Second Amended Plan.

Cantilo explained how the Second Amended Plan will operate. He described it as "completely scaleable," meaning that the elements of the Plan can

---

[5] Penn Treaty Network America Insurance Company, a Pennsylvania insurer, and its subsidiary, American Network Insurance Company (collectively, Penn Treaty), provided long-term care insurance to over 126,000 policyholders in all 50 states and the District of Columbia. Penn Treaty became insolvent for many of the same reasons that SHIP is insolvent, *i.e.*, benefit-rich policies were underpriced at inception and the company's active live reserves became understated. Penn Treaty was placed into rehabilitation by the Pennsylvania Insurance Commissioner on January 6, 2009. Rehabilitation ultimately proved unsuccessful, and on March 1, 2017, this Court ordered the liquidation of Penn Treaty.

respond to changes in the amount of the Funding Gap as SHIP moves through Phase One and into Phase Two and Phase Three. N.T., 5/17/2021, at 97. In Phase One, the policyholder's options are based on the If Knew Premium, and in Phase Two the options will be developed to establish a self-sustaining premium structure.[6] Cantilo testified that it was important to give each policyholder at least two options: (i) retain his current coverages by paying the actuarially justified premium (Option 4) or (ii) retain his current premium by adjusting coverages to match that premium (Option 1). Between those two options there is a non-forfeiture option (Option 3) that is more generous than a non-forfeiture option in liquidation and basic policy options (Options 2 and 2A), which provide a reasonable package of long-term care coverage at an affordable price.

Cantilo testified that the If Knew Premium was selected to establish the premium in Phase One because it is generally accepted by regulators across the country; it was the methodology used by guaranty associations to increase premium rates for policyholders in the Penn Treaty liquidation; it is an easy rate methodology to explain to policyholders; and it achieves the goal of putting policyholders on a level playing field when it is calculated on a seriatim basis.

Cantilo explained in detail each Phase One option in the Second Amended Plan. Option 1 is the downgrade option. It allows the policyholder to keep his current premium but reduces benefits until the premium is adequate, on an If Knew basis. The policyholder will not choose which benefits to downgrade, which was discovered to be too complicated in the Penn Treaty liquidation. The methodology for reducing benefits under Option 1 will proceed in the following

---

[6] The scope of Phase Two can only be determined after the completion of Phase One and an assessment of the remaining Funding Gap. Cantilo anticipates that the Rehabilitator will return to the Court at that point in the rehabilitation process.

sequence: elimination of benefit restoration provisions; elimination of benefit extension provisions; adoption of tax-qualified benefit triggers; discontinuation of return of premium provisions; removal of inflation protection and locking of maximum daily benefit at current levels; conversion from indemnity to reimbursement of actual expenses up to the maximum daily benefit amount; reduction in the maximum daily benefit; extension of any elimination period to 90 days and applying it to each period of care; reduction in the policy's maximum benefit period; elimination of all premium waiver provisions; and conversion of the policy to a pool of money with a reduction of the maximum benefit period to the amount required to match the current premium. Ex. RP-55 at 45-46; Ex. RP-56 at 69. If the first revision is sufficient to match the policy's coverages to the existing premium, no further coverage modifications will be made.

Under Option 2, the policyholder selects basic policy coverages and a corresponding If Knew Premium. After extensive policyholder outreach, the Rehabilitator selected the key components of long-term care that most policyholders desire if they cannot afford the most expensive package of coverages. These include a maximum benefit period equal to the lesser of the current benefit period or four years; a maximum daily benefit equal to the lesser of 80% of the current daily benefit or $300 for nursing facility care;[7] and an annual inflation adjustment capped at 1.5%. Option 2A, which is an enhanced version of Option 2, provides a maximum benefit period of five years and an annual inflation adjustment of 2% for a higher premium. Policyholders who elect Option 2 or 2A will not be expected to participate in Phase Two of the Second Amended Plan.

---

[7] The maximum daily benefit for facility care other than nursing home care is $225. The maximum daily benefit for home health care is $150.

Option 3 is the non-forfeiture option, which offers the policyholder a maximum benefit period of 2.5 years and a maximum daily benefit equal to the lesser of 80% of the current daily benefit or $300 for nursing facility care.[8]  Cantilo contrasted Option 3 with the standard non-forfeiture option in the industry, which offers the policyholder the equivalent of accumulated premium less claims. Typically, this results in only several months of coverage, particularly where the policy is rich in benefits.  By contrast, Option 3 provides a reasonable alternative to a "luxurious" policy.  Policyholders who elect Option 3 will not be required to participate in Phase Two of the Plan.

Option 4 allows the policyholder to keep his current coverages by paying the If Knew Premium.  Cantilo testified that this option is the least favored by the Rehabilitator because if the majority of policyholders choose this option the Funding Gap will only be reduced by half.  N.T., 5/17/2021, at 191.  This is because the If Knew Premium does not cover the prior years of premium inadequacy.

Cantilo explained that the options will vary depending on whether the policyholder is on claim or paying premium.  A policyholder on premium waiver may choose to pay a differential premium, *i.e.*, the difference between the waived premium and the If Knew premium.  The policyholder may choose not to pay the differential premium, but the benefits of his policy will be reduced in a commensurate amount.  Cantilo testified that the rationale behind the differential premium is to apportion the burden of rehabilitation among all policyholders, not just the subset still paying premium.  It would be unfair for the 13% of policyholders on premium waiver to be immunized from a premium adjustment at the expense of the other 87%.

---

[8] The maximum daily benefit for facility care other than nursing home care is $225.  The maximum daily benefit for home health care is $150.

Cantilo described the option election process, which will begin with the Rehabilitator sending every policyholder a packet of information containing three sections. The first section describes the policyholder's current policy, including the monthly premium, available benefits, maximum policy value and the applicable statutory guaranty association limit were SHIP to be liquidated. The second section provides information on each option and how it changes the key provisions of the policy, *e.g.*, duration of benefit period and maximum daily benefit amount. The amount of the maximum policy value not covered by the applicable guaranty association is also provided. The third section contains two key pieces of information: the policyholder's estimated annual premium should a liquidation be ordered and the policyholder's estimated self-sustaining premium in Phase Two of the rehabilitation. Cantilo explained that these two numbers will enable policyholders to better choose among the options, especially since Options 1 and 4 will subject them to Phase Two.

To create user-friendly policyholder election materials, the Rehabilitator has engaged consultants who specialize in preparing Medicare supplement materials. The election forms will use graphics and be intuitively easy to follow. The Rehabilitator also plans to post a video tutorial online to guide the policyholder through the election forms. Cantilo testified that the Rehabilitator's goal is 100% policyholder participation. If a policyholder whose current premium is below the If Knew Premium does not make an election by the deadline, there are default options. For policyholders on premium waiver, the default option is Option 1, the downgrade option, unless Option 3 will provide better coverage, in which case it will be the default. For policyholders paying premium, the default option is Option 2, the basic policy endorsements.

The Rehabilitator conducted considerable outreach about the rehabilitation of SHIP beginning in the early stages of the rehabilitation. The Rehabilitator participated in regular meetings of the National Association of Insurance Commissioners and organized numerous meetings and conference calls with state regulators. The goal was to design a rehabilitation plan to address all concerns, particularly those expressed about state-of-issue responsibility for premium rate review. The Rehabilitator set up a secure data site for interested persons that contains all of the exhibits to this proceeding, including the seriatim actuarial files for every policy. Individual reports were generated for each state explaining how resident policyholders of that state would fare under the plan.

To date, the Rehabilitator has received comments from approximately 100 policyholders. Cantilo testified that this was far fewer than the number of comments in Penn Treaty. As expected, most policyholder concerns related to reduction of benefits and rate increases. Cantilo was surprised how many policyholders were supportive of a rehabilitation and the plans submitted by the Rehabilitator.

The principal concerns raised by state insurance regulators related to the following areas: (1) treatment of reinsurance assumed; (2) setting of premium rates by the Rehabilitator and this Court rather than by state-of-issue regulators; (3) desirability of liquidation instead of rehabilitation; and (4) feasibility of the Second Amended Plan. Cantilo discussed each of these areas in turn.

On the first concern, Cantilo explained that SHIP's assumed reinsurance involved approximately 2,000 long-term care policies originally issued by American Health and Life, Primerica and TransAmerica, or the predecessors of those companies. SHIP's predecessors entered into agreements to reinsure 100% of

20

these policies and administer claims. In the case of TransAmerica, on December 29, 2020, this Court approved an agreement by which TransAmerica recaptured its policies from SHIP. Cantilo opined that the recapture was consistent with industry norms.

With regard to premium rates, Cantilo acknowledged the objections of the Intervening Regulators. They contend that the state where the policyholder resided when the policy was issued is solely responsible for the regulation of the policy's premium rate. Cantilo opined that this makes sense for solvent insurers, but when an insurer enters rehabilitation, the domiciliary state has sole responsibility for the insolvent insurer and the restructuring of its business. This responsibility includes the adjustment of premiums and policy coverages where necessary to correct the insurer's financial condition.

Cantilo testified that the Intervening Regulators' legal assertion that they have the right to review and approve premium rates for policies issued by SHIP in their states creates "some ironic consequences." N.T., 5/17/2021, at 157. For example, 34 policies issued in Maine, 84 policies issued in Massachusetts and 89 policies issued in Washington are held by policyholders who now reside in other states. Thus, the Intervening Regulators assert the right to set the rates for 207 policyholders who live outside of their states. Ex. RP-56 at 97. Further, 21 policyholders who reside in Maine, 83 policyholders who reside in Massachusetts and 87 policyholders who reside in Washington had their policies issued in other states. Under the Intervening Regulators' legal assertion, other state regulators would set the rates for 191 policyholders residing in the states represented by Intervening Regulators. *Id.* at 98. In short, their inflexible view of rate regulation results in approximately 400 policyholders residing in Maine, Massachusetts and

21

Washington having their rates set by states in which they do not reside. The better approach, in Cantilo's view, is for the domiciliary regulator of an insurer in rehabilitation to manage rate and contract modifications as part of a comprehensive rehabilitation plan.

Nevertheless, the Second Amended Plan contains an Issue State Rate Approval Option. As Cantilo explained, every state will be given the option of opting out of the rate approval section of the Second Amended Plan. If a state opts out, the Rehabilitator will file an application to increase premium rates for policies issued in that state to the If Knew Premium level. No rate increase will be sought for policies on premium waiver or which are already at or above the If Knew Premium. The Rehabilitator will file the application on a seriatim basis to eliminate subsidies and restore a level playing field. The regulator for the opt-out state will then render a decision on the application; if it is only partially approved, the Rehabilitator will downgrade the benefits for the affected policies.[9] Cantilo testified that this is essential to eliminate the subsidies that exist between policyholders across states by virtue of uneven rate increase approvals over the years. Each opt-out state policyholder will still have four options, which are not exactly the same as those offered in the Second Amended Plan. They are: (1) pay the approved premium and have benefits reduced to match; (2) accept a downgrade of benefits to match the current premium; (3) accept an issue-state non-forfeiture option; or (4) keep the current benefits and pay the If Knew Premium. Cantilo pointed out that the non-forfeiture option available to opt-out policyholders will not be as generous as the enhanced non-forfeiture option in Option 3 of the Second Amended Plan. There will also be no "basic policy benefits" option, *i.e.,* Option 2 in the Plan.

---

[9] If the state takes no action on the rate application within 60 days, it will be deemed denied.

22

Cantilo next addressed the Intervening Regulators' argument that immediate liquidation of SHIP is preferable to rehabilitation. In this regard, the Intervening Regulators focus on the present value of future benefits less the present value of future premiums, also referred to as the "Carpenter value," to support their view that policyholders would fare better in a liquidation. N.T., 5/17/2021, at 175.[10] Cantilo criticized this measure because it does not give an accurate picture of a policyholder's situation. He offered the example of an actual 92-year-old SHIP policyholder currently paying $2,761 for a policy with unlimited benefits. Ex. RP-56 at 102. Using the Intervening Regulators' preferred methodology, the "Carpenter value" of that policy is $33,890, which is higher than the "Carpenter value" produced under any of the four Plan options. However, to receive this value of $33,890, the policyholder would have to pay $11,520 in annual premium. By contrast, this policyholder could choose Option 3, a paid-up policy with a slightly lower "Carpenter value" of $33,550. With a paid-up policy, however, this policyholder would receive 2.5 years of coverage and never pay another premium. Cantilo offered other examples where Option 3 would be the best option for a policyholder, given the amount of premium the policyholder would be required to pay to the guaranty association in a liquidation. *See, e.g.*, Ex. RP-56 at 103. Cantilo opined that these are not exceptions; "[t]here are many cases where the raw projection of future benefits less future premium doesn't really tell you what the real value of the policy is." N.T., 5/17/2021, at 177.

Cantilo discussed several different ways to compare the value of the Plan options to what would be available in a liquidation. Using the Intervening

---

[10] "Carpenter value" refers to the United States Supreme Court's decision in *Neblett v. Carpenter*, 305 U.S. 297 (1938), which is often cited for the proposition that, in order for a rehabilitation plan to be constitutional, policyholders must fare as well in rehabilitation as they would in a liquidation.

Regulators' standard of present value of future benefits less present value of future premiums, 85% of policyholders will have at least one option as favorable as liquidation and 15% will not. Ex. RP-56 at 105. Using the present value of future benefits divided by annual premiums, those numbers are 79% and 21%. *Id*. at 106. Using the maximum policy value divided by annual premium, those numbers are 89% and 11%. *Id*. at 107. Using the maximum policy value less present value of future premiums, those numbers are 96% and 4%. *Id*. at 108. Finally, using the Rehabilitator's preferred standard of maximum policy value, also referred to as the "benefit account value" or "lifetime maximum benefit" in some policies, *id*. at 104, 100% of policyholders will have at least one option in the Plan that offers the same or a better value than in a liquidation. *Id*. at 109.

Cantilo acknowledged that these are actuarial techniques that rely on the exercise of professional judgment. He opined that the maximum policy value is what policyholders use when they purchase an insurance policy, *i.e.,* the maximum daily benefit and the maximum benefit period.

Cantilo offered additional reasons to explain why rehabilitation is preferable to liquidation. First and foremost is the value of policyholder choice. Second, the Second Amended Plan contains features that would not be available to policyholders in liquidation, such as an option to retain their current policy level of coverage, which may exceed the applicable guaranty association cap, by paying the If Knew Premium. Third, there is the enhanced non-forfeiture option that provides reasonable coverage for no additional premium. In a liquidation, the non-forfeiture option would be locked into the policy's present coverages and terms, which may result in a very short period of coverage. Fourth, the Plan reduces or eliminates the subsidies in the current rate structure, which cannot be done in a liquidation.

Finally, Cantilo testified about the likelihood of success of the Second Amended Plan. He opined that the Plan is designed to eliminate the Funding Gap over three phases. This is not likely to happen in Phase One, but Phase One will materially reduce the Funding Gap.

Cantilo offered an exhibit illustrating the amount of the Funding Gap reduction under 11 hypothetical policyholder election scenarios. In general, the more that policyholders elect to pay the If Knew Premium for their current benefits (Option 4), the worse the outcome for the Funding Gap. For example, in Scenario 1, where 7% elect Option 1, 8% elect Option 2 or 2A, 4% elect Option 3 and 81% elect Option 4, the Funding Gap is reduced by $525 million. Ex. RP-56 at 113. At the other extreme, in Scenario 11, where a very small number of policyholders elect Option 4 and the rest split evenly among Options 1, 2, 2A and 3, the Funding Gap is completely eliminated. *Id.* This underscores how the policyholders will be the masters of the fate of SHIP. No matter how much of the Funding Gap is eliminated in Phase One, SHIP will be in better shape if it eventually has to be liquidated because the discriminatory subsidies in the premium rate structure will be eliminated, and the policies will be right-sized for the premium the policyholder is willing to pay.

On examination by the Intervening Health Insurers, Cantilo testified that the SHIP policies contain provisions that allow SHIP to modify the premium rate. Some policies provide that rate increases will require the approval of state regulators, while others specify that rate increases may be sought only where an increase is warranted given the claims experience of the cohort of policyholders covered by the same policy form. Cantilo stated that these provisions are standard in long-term care insurance policies. The Rehabilitator designed the If Knew

25

Premium methodology in the Second Amended Plan to be consistent with the standards for setting long-term care insurance premium rates, which are substantially the same in every state.

### b. Marc Lambright

Marc Lambright, an accident and health insurance actuary with Oliver Wyman, testified for the Rehabilitator. Lambright testified that the Pennsylvania Insurance Department engaged Oliver Wyman in early 2017 to conduct a targeted examination of SHIP's reserves and the assumptions used by its actuarial firm, Milliman, to set the reserves. Following its examination, Oliver Wyman submitted a report making several observations: Milliman's cash flow testing assumptions were too optimistic; claim reserves for the preceding years were inadequate; and the Beechwood investment program was riskier than assumed in the 2016 cash flow test report. Ex. RP-56 at 53. Oliver Wyman made several recommendations for the ongoing financial monitoring of SHIP. They included using more recent experience to develop morbidity, lapse and termination assumptions. *Id*. Milliman largely rejected Oliver Wyman's recommendations.

In 2018, after SHIP was placed under the supervision of the Insurance Department, Cantilo asked SHIP to devise a corrective action plan.[11] Cantilo also asked Oliver Wyman to continue analyzing SHIP's financial condition. Lambright testified that much of 2018 was spent pressing SHIP to substantiate some of its actuarial assumptions. Lambright testified that the Beechwood investment losses ($176 million) and the premium deficiency reserve booked in 2018 ($347 million) had a significant impact on SHIP's financial picture. N.T., 5/18/2021, at 374. In

---

[11] Section 510(a) of Article V authorizes the Insurance Commissioner to "make and serve upon the insurer and any other persons involved, such orders … as are reasonably necessary to correct, eliminate or remedy" the insurer's condition that required the supervision. 40 P.S. §221.10(a).

26

2019, Lambright assisted Vincent Bodnar as he built the corrective action plan that would become the rehabilitation plan.

### c. Vincent Bodnar

Vincent Bodnar, an actuary at Oliver Wyman with a specialty in long-term care insurance, testified as an expert witness. Bodnar performed actuarial work for the Rehabilitator and was involved in developing the Second Amended Plan, including the Phase One options to be offered to the policyholders.

Bodnar described the seriatim model as the core of the Second Amended Plan. A seriatim model, which produces actuarial projections for each policy individually, has become the industry standard in the past five years. The input to the seriatim model consists of individual policyholder characteristics such as age, gender, issue age, benefit features of the policy, and the premium charged. Applied to the input file are actuarial assumptions, including morbidity and mortality rates, lapse rates, and exhaustion rates, which Oliver Wyman has developed using SHIP's historical experience. The seriatim model projects future premiums and future claims for each policy on a month-by-month basis. N.T., 5/18/2021, at 397.

Bodnar explained that the If Knew Premium methodology employed in Phase One determines the premium an insurer would charge had it known when the policy was issued what it knows today, *i.e.*, that it would experience lower returns on investments, lower mortality rates, lower lapse rates, and higher claim incidence rates. The If Knew Premium assumes a 60% lifetime loss ratio from inception of a policy, *i.e.,* the use of 60% of expected premium to pay benefits to policyholders. The other 40% of expected premium is used to pay salaries, administrative overhead, premium taxes, federal taxes and profit for the insurer. The goal of the lifetime loss ratio is to establish a premium level that is reasonable in relation to the benefits paid.

The 60% lifetime loss ratio is the benchmark required for a premium rate increase in most states. The If Knew Premium methodology employed in Phase One will be actuarially justified and will not recoup past underpricing losses, although several states allow such recoupment. In the Penn Treaty liquidation, guaranty associations sought premium rate increases from the states based on an If Knew Premium methodology similar to the one employed in Phase One.

Because the Second Amended Plan intends to set premium rates on a seriatim basis, each policyholder will receive an individual premium increase calculated on the benefit features of his policy and the policyholder's characteristics. The model does not consider individual claim experience but, rather, "all the various variants that make up a given assumption" for a risk class. N.T., 5/18/2021, at 412. By contrast, in a traditional rate application process, insurers request state approval of an aggregate premium rate increase, although their models might be developed on a seriatim basis.

Bodnar testified that it is common for an insurer to receive mixed responses to a premium rate increase request from state regulators because each state has its own approach to reviewing rates. Additionally, the rate review process typically takes between 90 days and 2 years. Protracted rate reviews with drastically different outcomes have resulted in some SHIP policyholders paying a premium rate that subsidizes the inadequate premium rates of other SHIP policyholders. The Second Amended Plan seeks to eliminate this inequitable discrimination in premium payments.

Based on his experience with insurance product development and consumer choices, Bodnar testified that, generally, policyholders look at maximum policy value, *i.e.,* the maximum daily benefits, elimination period and premium rate,

in choosing an insurance policy. Bodnar considered all these factors in developing the options in the Second Amended Plan. Option 1 allows policyholders to retain their current premium rates with reduced benefits. Options 2 and 2A provide policyholders with basic policy coverages at corresponding If Knew Premium rates. The basic policy retains the key components of long-term care insurance and reduces or eliminates some features, such as a 4.5% inflation rider, that are not so important to policyholders. The maximum daily benefit, although reduced, would continue to provide meaningful coverage to most policyholders. The policyholders who elect Option 2 or 2A would not be subject to a rate increase in Phase Two, which is an appealing feature. In the Penn Treaty liquidation, policyholders were offered a benefit reduction option similar, but not identical to, Options 1 and 2 or 2A, but Bodnar did not recall how that affected their premium level. N.T., 5/19/2021, at 517, 520. By contrast, the Second Amended Plan proposes to offer policyholders three options by which to reduce their coverages and save premiums.

Option 3 of the Second Amended Plan offers a non-forfeiture option, which allows policyholders to receive up to 2.5 years of coverage and stop paying any additional premium. This is more generous than the standard non-forfeiture option, which caps coverage to the amount of premiums the policyholder has paid from inception. Policyholders in the Penn Treaty liquidation who chose the standard non-forfeiture option received continued coverage for a shorter period of time, sometimes only months. *Id*. at 435.

Option 4 of the Second Amended Plan allows policyholders to keep their current policy benefits and pay the If Knew Premium rate to retain those benefits. The guaranty associations in the Penn Treaty liquidation did not offer an equivalent option to policyholders whose coverages exceeded the statutory limits.

29

Instead, they offered a rate increase option that retained the policy's coverages up to the statutory maximum amount allowed for each resident.

Bodnar explained how the different Phase One options relate to Phase Two of the Plan. Policyholders who elect Options 1 and 4 and have a policy providing coverage in excess of the guaranty association limits will be subject to a rate increase in Phase Two. Phase Two seeks to deploy a self-sustaining premium rate methodology, which will keep the lifetime loss ratio at 60% and thus be actuarially justified. Phase Two is not absolutely necessary under the Second Amended Plan because Phase One could close the Funding Gap, or the assumptions deployed in Phase One could play out differently than projected. Bodnar opined that any meaningful reduction in the Funding Gap during the rehabilitation would be a success.

Bodnar opined that a rehabilitation as proposed in the Second Amended Plan, as opposed to an immediate liquidation, presents policyholders with better options; sets the premium rates to equitable levels; and reduces SHIP's Funding Gap. There is no formulaic method to determine whether policyholders are better off in a rehabilitation or in a liquidation; the so-called "Carpenter test" is not an actuarial test. Policyholders who choose Option 4 will have a policy with a net present value greater than or equal to what they would have in liquidation because it will not be capped at the level set forth in the applicable guaranty association statute. However, Option 4 has the least effect on reducing the Funding Gap. N.T., 5/19/2021, at 512-513.

Bodnar opined that policyholders are likely to consider the maximum policy value/premiums analysis or the maximum policy value analysis in making determinations. The present value analysis, or "Carpenter test," is appropriate for

evaluating the impact of the Phase One options on SHIP's liabilities. However, he explained that policyholders do not use a present value analysis when they choose their long-term care insurance coverage. Nor would they rely solely on the present value analysis to select one of the options offered under the Second Amended Plan.

Upon approval of the Second Amended Plan, Bodnar and the actuarial team at Oliver Wyman will prepare an actuarial memorandum in support of the If Knew Premium rates, similar to what would be submitted to state regulators in a rate increase filing. In developing the Second Amended Plan, Oliver Wyman has prepared an actuarial report describing the If Knew Premium rating methodology and an assumption report, Ex. RP-16 and Ex. RP-17, and has gathered all the information needed for the actuarial memorandum. N.T., 5/19/2021, at 460.

### ii. Intervening Regulators' Evidence
### a. Frank Edwards

Frank Edwards, the vice president and chief life and health actuary of INS Consultants, testified as a fact witness on behalf of the Intervening Regulators. Edwards testified that under the Second Amended Plan, policyholders bear the responsibility for the $1.2 billion Funding Gap through benefit reductions and premium increases. By contrast, in liquidation, policyholders would bear a burden of approximately $397 million, and the guaranty associations would bear a burden of approximately $837 million. This represents the difference between the net amount the guaranty associations would pay to policyholders and the distributions they would receive from the SHIP estate. Because a rehabilitation does not trigger the guaranty associations, these funds will not be available to benefit policyholders under the Second Amended Plan.

Edwards observed that among the four options in the Second Amended Plan for Phase One, Option 4 provides a net present value for approximately 83% of policyholders that is greater than they would receive in a liquidation. The other options provide policyholders with a net present value that is lower than they would receive in liquidation.

Oliver Wyman presented 10 scenarios to illustrate the potential results of the Second Amended Plan for SHIP's liabilities, each leaving a deficit that ranged from $699 million to $186 million. Ex. RP-16 at 11. Only Scenario 11, later added, eliminates the Funding Gap. Based on the information provided by Oliver Wyman, Edwards calculated a "Best Interest" scenario, which assumed that each policyholder will choose the option that provides the greatest net present value, or "Carpenter value." Ex. SIR 5-4. Option 4 would give 67.13% of the policyholders the greatest net present value and would reduce SHIP's Funding Gap by $184 million. *Id*.

Edwards addressed a comparison of rehabilitation to liquidation under Phase Two. Edwards calculated the effects of hypothetical Phase Two premium increases on policyholders who selected Option 4 in Phase One. Assuming a premium increase of 50% in Phase Two, the percentage of policyholders receiving a net present value greater than in a liquidation under Option 4 drops to 33.89%. The percentage of policyholders in a rehabilitation, in the aggregate, that would receive a net present value greater than liquidation is 54.57%. Assuming a premium increase of 100% in Phase Two, the percentage of policyholders for whom Option 4 provides a net present value greater than in a liquidation drops to 22.92%. The percentage of all policyholders in a rehabilitation, in the aggregate, that would receive a net present value greater than in a liquidation is 47.21%. Even so, these

hypothetical premium increases of 50% and 100% would leave remaining a Funding Gap of approximately $858 million and $676 million, respectively. Ex. SIR 5-5.

Edwards observed that the information presented by Oliver Wyman indicated that the net present value of Option 2 for policies with benefits in excess of guaranty association limits is typically less than the net present value of the guaranty association limits. Ex. SIR 5-6.

Edwards did not evaluate Oliver Wyman's work. He compared the Second Amended Plan to liquidation using hypotheticals in which policyholders made elections based solely on maximizing the present value of future policy benefits minus the present value of future premiums, or the "Carpenter value."

### iii. Intervenor NOLHGA's Evidence

### a. Peter Gallanis

Peter Gallanis, the president of NOLHGA, testified as a fact witness. NOLHGA intervened in this proceeding to offer its suggestions on the Second Amended Plan; provide background information on the guaranty association system; and identify and request certain information material to its guaranty association members.

NOLHGA's members are life and health guaranty associations, one for each state and the District of Columbia, which are nonprofit entities created by state statutes to protect policyholders when a life or health insurance company is liquidated. In multi-state insurance insolvencies, the guaranty associations collaborate and coordinate through NOLHGA to fulfill their statutory obligations. NOLHGA has been involved in approximately 100 multi-state insurance receiverships, nine of which involved long-term care insurance. If SHIP goes into liquidation, most NOLHGA member guaranty associations would be activated to

33

provide coverage to SHIP policyholders, subject to the statutory limit on coverage in the member's state, which is generally $300,000 per resident.

Gallanis testified that the Second Amended Plan should emphasize that the options that policyholders select in Phase One will be permanent. The Second Amended Plan's discussion of SHIP's unfunded liability needs clarification, or it should be eliminated. The subject need not be addressed until a liquidation may occur.

He testified that the Rehabilitator's sample Illustrative Policyholder Guidance Pages on guaranty association coverage and premium rates in liquidation could be misleading. In response, NOLHGA prepared a sample Summary of Policyholder Protection by Guaranty Associations in Liquidations that it believes should be sent to policyholders during Phase One. Ex. N-1. Gallanis believes NOLHGA should review all policyholder communications that refer to liquidation or guaranty associations and be allowed to comment on these communications before they are sent to policyholders.

Gallanis testified that NOLHGA wants more information on SHIP's reinsurance agreements with Transamerica, American Health and Life Insurance Company, and Primerica Life Insurance Company. NOLGHA also seeks more information on SHIP's in-force policies that are not long-term care policies.

Gallanis explained that members of a guaranty association are licensed life and health insurers. If SHIP is placed under an order of liquidation, the guaranty associations will provide resident policyholders with coverage up to the lesser of the maximum benefit level provided in the policy or the statutory limit for guaranty

association coverage, which is $300,000 per resident in most states.[12]  The guaranty associations may continue coverage under the policy; work with the receiver to transfer the business to a financially solvent insurer; or issue alternative policies. The guaranty associations may seek premium rate increases or offer policyholders modified benefits based on current premium rates, as was recently done in the Penn Treaty liquidation.  The guaranty associations generally do not charge premiums to policyholders who have been on premium waiver.  The options offered by the guaranty associations in the Penn Treaty liquidation are illustrative of what could be offered in a potential SHIP liquidation.

In a liquidation, the guaranty associations will assess their member insurers, using the methodology set forth in their governing statutes to determine each member insurer's assessment.  The member insurers pay the assessments from their general accounts.  In some states, the member insurers can offset a portion of the assessment against state premium taxes that the insurers would otherwise owe. Member insurers can also impose surcharges on their policyholders to fund assessments.  The guaranty associations are not funded by state revenues.

Gallanis explained that NOLHGA does not endorse or oppose the Second Amended Plan.  NOLHGA intends to monitor the rehabilitation if this Court approves the Second Amended Plan, so that the guaranty associations will be prepared if SHIP ultimately is liquidated.

### b.  Matthew Morton

Matthew Morton, an actuary with the Long Term Care Group and an advisor to NOLHGA, testified as a fact witness about guaranty association coverage

---

[12] The guaranty association limits range between $100,000 in Puerto Rico, $300,000 in 42 states and the District of Columbia, $500,000 in 6 states, $615,525 in California, and no limit in New Jersey.

and premium rate increases in liquidation. Morton assisted NOLHGA in several long-term care insurer insolvencies, including the Penn Treaty liquidation.

In a liquidation, a policyholder receives a continuation of coverage from a guaranty association. The policy's benefits are paid in full until the policyholder exhausts the maximum benefit amount or maximum coverage period set forth in the policy, or until the payments reach the statutory coverage limit. Many long-term care policyholders are not affected by the statutory coverage limit because: (1) the policy's maximum benefit amount is less than the statutory coverage limit; (2) the policyholder never goes on claim; or (3) the policyholder does not stay on claim long enough to reach the statutory coverage limit.

In the Penn Treaty liquidation, the guaranty associations implemented a nationwide rate increase program, which resulted in 34 states approving 100% of the requested rate increases; 11 states approving between 80% and 100% of the requested rate increases; and 3 states approving less than 60% of the requested rate increases. No state denied a rate increase request. The majority, 44 states, approved the initial rate increase filing within 15 months. The guaranty associations spent 6 to 12 months preparing and filing the rate increase applications.

The guaranty associations' methodology for calculating premium rate increases in the Penn Treaty liquidation was similar to the If Knew Premium methodology proposed in the Second Amended Plan, with two exceptions. First, the Second Amended Plan proposes to calculate rate increases seriatim, or individually, while Penn Treaty's rate increase applications were developed on a cohort basis, by which policyholders were grouped together by policy form. The cohort basis is the industry standard for an insurer that is a going concern. Second, the Second Amended Plan proposes to calculate rate increases based on the total maximum

value of the policy. In Penn Treaty's liquidation, the premium rates were calculated based on benefits being capped at the guaranty association statutory limits.

Morton testified that the premium rate increase methodology used by the guaranty associations in the Penn Treaty liquidation "largely" addressed the inequities in premium rates and the cross-state rate subsidization issue. N.T., 5/20/2021, at 806. When asked on cross-examination to expound on his understanding of "largely," Morton acknowledged that using a cohort method to adjust premium rates results in some policyholders paying more than the If Knew Premium. *Id*. at 817-18. If a seriatim method is used, all policyholders will pay the If Knew Premium and no more.

In the Penn Treaty liquidation, the default option for policyholders who failed to make elections was to accept the rate increase. Policyholders were offered policy modifications, including lowering daily benefits or the inflation rider; a reduced paid-up policy; or a cash-out option in exchange for termination of the policy. Only one state approved the cash-out option. Approximately 76% of the Penn Treaty policyholders accepted the rate increase, among which "a little bit less than a half" took the option by default; 13% of the policyholders reduced their benefits; 8% of the policyholders elected to cash out; and 3% of the policyholders elected a reduced paid-up policy. *Id*. at 812. The guaranty associations treated Penn Treaty policyholders on premium waiver the same before and after the liquidation by continuing the waiver.

### iv. Intervening Agents and Brokers' Evidence
### a. Daniel Schmedlen

Daniel Schmedlen, Chief Executive Officer of LTC Global, testified on behalf of the Intervening Agents and Brokers. These agents and brokers are all

employed by LTC Global and are paid commissions by SHIP. The commission is set forth in the agency agreement and based on a percentage of premium. The policyholder pays a premium to the insurer, which deducts a certain percentage of the premium and remits it to the agent as a commission. The agent is not obligated to contact the insured after issuance of the policy, although the agent might accept the initial premium payment on behalf of the insurer.

A sample agent agreement was introduced into evidence by the Rehabilitator. It provided that the agent and successors "shall have the vested right to receive all commissions payable under this [a]greement." Ex. RP-10 at 3. Schmedlen understood this language as creating the agent's vested property interest in that part of any premium collected by SHIP that it owed to the agent as a commission. LTC Global expects that its agents will continue to receive commissions during SHIP's rehabilitation, as they did during Penn Treaty's rehabilitation.

The insurer determines the amount of commission payable to the agents. Once a policy is issued and delivered, the agent is paid a commission in accordance with the commission schedule set forth in the agency agreement. The first-year commission is higher than the renewal commission, and the amount of renewal commission changes with time. The commission schedule in the sample agent agreement showed that the first-year commission ranged from 45% to 70% of the first-year premium, depending on the age of the policyholder. After 10 years, the commission is typically reduced to a percentage of premium in the "middle single digits." N.T., 5/20/2021, at 850. If the insurer has to refund any portion of the premium to the insured, the agent returns his commission to the insurer in proportion

to the refunded premium. Where there is no premium paid, there is no commission owed to the agent.

### v. Intervening Health Insurers' Evidence

Intervening Health Insurers introduced into evidence six sample insurance policies issued by SHIP's predecessors and assumed by SHIP. The policies provided that SHIP may increase premium rates over time without specifying the methodology to be used in calculating the rate increases. The policies are silent on agent and broker commissions.

### vi. Intervening Policyholders' Evidence

### a. James Lapinski

Intervenor James Lapinski, a policyholder of SHIP as well as a broker, testified on his own behalf. He expressed concern about the Second Amended Plan's discussion of the impact of the COVID-19 pandemic on the long-term care insurance industry. He requested that the Rehabilitator update the discussion with more recent data. Lapinski presented a three-page excerpt from the Society of Actuaries report, dated September 30, 2020, which indicated that COVID-19 has had an impact on emerging long-term care insurance experience through higher mortality and lower claim incidence. An excerpt of a newsletter produced by Fairfax County, Virginia, suggested that more than 80% of COVID-19 deaths have been adults over 65 years old. Further, 34% of COVID-19 deaths in the United States have been seniors living in long-term care facilities, which accounts for less than 1% of the U.S. population. Lapinski opined that a combination of a decline in claim utilization and increase in lapse or cancellation of policies suggests that SHIP has experienced a major decrease in claims experience due to the pandemic.

Lapinski presented a balance sheet of SHIP showing that the value of SHIP's bond holdings as of December 31, 2020, declined by approximately $500 million from the previous year. SHIP's reported cash on hand and short-term investment income also declined from the previous year by approximately $500,000. This does not correlate with the decrease in the value of the bonds. Lapinski questioned the changes in reserves shown in the balance sheet. Specifically, he requested the Rehabilitator to explain the decline in SHIP's capital and surplus from approximately $12 million in 2017 to a deficit of $916 million in 2019, as well as the decline in the number of policies in force from 151,000 in 2009 to approximately 39,000 as of the filing of the Second Amended Plan. Observing that the Second Amended Plan contains excerpts from SHIP's unfiled 2019 statutory financial statement and the internal 2020 financial information (*see* Appendix B of the Second Amended Plan), Lapinski requested that SHIP file its 2019 and 2020 statutory financial statements before this Court rules on the Second Amended Plan.

Lapinski and his wife pay annual premiums totaling $9,000 for their three policies. Over the past 25 years, they have paid over $200,000 in premiums. He estimated that skilled nursing facilities cost $500 per day, which they cannot afford without insurance coverage. Lapinski raised concerns with the timing of the rehabilitation and stated his desire for SHIP to avoid the lengthy process that Penn Treaty had gone through prior to liquidation.

**b. Rose Marie Knight**

Rose Marie Knight, a policyholder, also testified. She agreed with Lapinski's testimony. She has been a policyholder for 22 years and currently pays an annual premium of $1,200. She questioned why SHIP has not raised her premium for the last four or five years. Knight's policy has a lifetime benefit period. She will

have to pay a higher premium to retain this maximum coverage period under the Second Amended Plan. Knight expressed concern about her ability to pay a higher premium and becoming a burden on her children. N.T., 5/21/2021, at 935. She noted that the government has recently incurred great debts, which will cause inflation that "is starting to hit." *Id*. at 933-34.

Both Lapinski and Knight expressed concern and confusion as to the Second Amended Plan's proposed policy restructuring, which they interpreted as removing benefits or cancelling guaranty association coverage.

## III. Standard of Review

Section 516(b) of Article V authorizes the Rehabilitator to "take such action as [she] deems necessary or expedient to correct the condition or conditions which constituted the grounds for the order of the court to rehabilitate the insurer. … [She] shall have full power … to deal with the property and business of the insurer." 40 P.S. §221.16(b). The legislatively stated purpose of Article V, to which the Court must give effect, is "the protection of the interests of insureds, creditors, and the public generally...." and the "equitable apportionment of any unavoidable loss" through, *inter alia*, "improved methods for rehabilitating insurers...." *Grode v. Mutual Fire, Marine and Inland Insurance Co.*, 572 A.2d 798, 803 (Pa. Cmwlth. 1990) (*Mutual Fire I*) (single-judge opinion) (quoting Section 501 of Article V, 40 P.S. §221.1).

The Pennsylvania Supreme Court has explained this Court's role in a rehabilitation as follows:

> In overseeing the course of rehabilitation to check any abuse of discretion by the Commissioner, the Commonwealth Court is authorized to "approve or disapprove the plan [of rehabilitation] proposed, or may modify it and approve it as modified. If it is approved, the rehabilitator shall carry out the plan." 40 P.S. §

41

221.16(d). Therefore, in order for the Plan to warrant the Commonwealth Court's imprimatur it must be found to be free from any abuse of the Rehabilitator's discretion.

*Foster v. Mutual Fire, Marine and Inland Insurance Co.*, 614 A.2d 1086, 1091 (Pa. 1992) ("*Mutual Fire II*"). Further, "it is not the function of the courts to reassess the determinations of fact and public policy made by the Rehabilitator." *Id*. Our Supreme Court has explained:

> 'It has been established as an elementary principle of law that courts will not review the actions of governmental bodies or administrative tribunals involving acts of discretion *in the absence of bad faith, fraud, capricious action or abuse of power* .... That the court might have a different opinion or judgment in regard to the action of the agency is not a sufficient ground for interference; *judicial* discretion may not be substituted for *administrative* discretion.'

*Id*. at 1092 (quoting *Norfolk and Western Railway Co. v. Pennsylvania Public Utility Commission*, 413 A.2d 1037, 1047 (Pa. 1980) (emphasis in original)).

With the above principles in mind, the Court considers whether the Rehabilitator abused her discretion in formulating the Second Amended Plan. The Court is also mindful that "the Rehabilitator is constrained by constitutional mandate[s]." *Mutual Fire I*, 572 A.2d at 804.

## IV. Legal Analysis

### A. The Second Amended Plan Serves a Rehabilitative Purpose and is within the Discretion of the Rehabilitator

#### 1. Goals of the Plan

There is no fixed goal that every rehabilitation plan must satisfy to obtain this Court's approval. Specifically, the Pennsylvania Supreme Court has stated that a

> rehabilitation, in order to be legitimate, does not have to restore the company to its exact original condition. So long as the rehabilitation properly conserves and equitably administers "the assets of the involved corporation in the interest of investors, the public and others, (with) the main purpose being the public good" the plan of rehabilitation is appropriate.

*Mutual Fire II*, 614 A.2d at 1094 (quoting 2A COUCH ON INSURANCE 2d §22.10).

The unrefuted testimony of the Rehabilitator's witnesses established two overarching goals of the Second Amended Plan: (i) to reduce or eliminate the Funding Gap and (ii) to eliminate SHIP's inequitable and discriminatory premium rate structure, which is marked by cross-policyholder subsidies. The Plan will meet these goals by setting premium rates for all policyholders pursuant to an actuarially sound methodology, the If Knew Premium rate, which is widely accepted by regulators across the country, and by offering policyholders meaningful options. Instead of being forced to accept rate increases commensurate with their current coverages, policyholders will have the option to reduce coverages, thereby reducing their indicated premium increase.

In pursuing these goals, the Second Amended Plan addresses one of the major causes of SHIP's financial distress: policy underpricing. The Plan will address underpricing by (i) resetting premiums, on a prospective basis, to what they would have been without the erroneous actuarial assumptions and (ii) doing so on a seriatim basis, thereby ensuring that the premiums going forward are consistent across the entire pool of policyholders so that similarly situated policyholders will not be paying different premiums. The Plan will give policyholders meaningful choices for coverage in lieu of rate increases, without placing the cost of SHIP's historical policy underpricing upon the public through the guaranty association system. These goals serve the public good. *See Mutual Fire II*, 614 A.2d at 1094,

43

n.4 (determining that the state's interest in "regulat[ing] the fiscal affairs of its insurers for the welfare of the public" is a legitimate and significant public purpose).

## 2. No Contrary Evidence

The Intervening Regulators, who object to the Second Amended Plan in its totality, did not introduce an expert witness to dispute any of the Rehabilitator's actuarial projections, including the impact of the various options on policyholders and the Funding Gap, or the Plan's proposed premium rate methodologies. The Intervening Regulators' actuary, Frank Edwards, testified as a fact witness, and he acknowledged that he was not asked to evaluate the Rehabilitator's work.

Edwards' testimony consisted of "mathematical exercises," N.T., 5/19/2021, at 564, that compared the Plan to a liquidation. He assumed that policyholders are "better off" with the "maximum present value" of their policies. *Id*. at 568. Known as the "Carpenter value," maximum present value is future benefits minus future premiums, adjusted to their present value. Edwards acknowledged that he could not opine on policyholder preferences. Cantilo and Bodnar, both qualified experts, testified persuasively that policyholders do not make choices based on the maximum present value of their policies. Rather, policyholders will rely on other metrics, most notably the maximum policy value, such as maximum daily benefit and maximum benefit period, to make choices. Using those metrics provides a better outcome for policyholders than they would experience in liquidation.

## B. The Goals of the Plan Could Not Be Achieved in Liquidation

The Rehabilitator's evidence demonstrated that immediate liquidation of SHIP would be improvident for several reasons. First, a liquidation of SHIP will not address the Funding Gap. Second, a liquidation will not address the existing

inequitable premium rate structure and cross-policyholder subsidies. Instead, it will perpetuate those problems. Third, a liquidation of SHIP will unnecessarily delay any resolution of SHIP's financial condition. Fourth, the options available to policyholders under the Second Amended Plan are better than what would be offered by guaranty associations in a liquidation.

### 1. Liquidation Will Not Address the Funding Gap

As noted, the Funding Gap is largely attributable to significant historical underpricing of SHIP's policies. In a liquidation, the entire cost of this shortfall will be shifted to the guaranty association system and, ultimately, to the public. As NOLHGA's Peter Gallanis acknowledged, the guaranty associations will fund the cost of the underpricing by assessing their member companies, which, in turn, fund the assessments from their policyholder generated funds. These insurers will then recoup some portion of the loss through premium tax offsets or by raising rates they charge to their own policyholders. The Rehabilitator concluded that shifting the burden to taxpayers and policyholders of other life and health insurers will not serve the "public good." *Mutual Fire II*, 614 A.2d at 1094. That determination is within her discretion and is entitled to deference. *Id*. at 1091 ("[T]he involvement of the judicial process is limited to the safeguarding of the plan from any potential abuse of the Rehabilitator's discretion.").

### 2. Liquidation Will Perpetuate the Inequitable Premium Rate Structure

In a liquidation of SHIP, assuming the guaranty associations would seek rate increases as they did in the Penn Treaty liquidation, similarly situated policyholders will continue to pay different rates. NOLHGA's actuary, Matthew Morton, acknowledged that this is attributable to the guaranty associations' practice of seeking rate increases for cohorts of policyholders. Using a cohort method results

in some policyholders paying more than the If Knew Premium in liquidation. The Second Amended Plan will adjust premium rates on a seriatim basis, which eliminates the possibility of any policyholder paying more than the If Knew Premium.

Further, the guaranty associations must request rate increases from the state of issue, not the state where the policyholder resides. The experience from the Penn Treaty liquidation showed that states do not act uniformly. For example, Florida (one of Penn Treaty's largest states by premium) granted only 50% of the guaranty associations' requested, and actuarially justified, rate increases for policies written in that state. Florida similarly has refused to grant SHIP's requested rate increases, and there is no reason to believe the result would be any different in a liquidation. *See* Ex. RP-53 (showing that since 2009, SHIP has requested approximately $62.6 million in premium rate increases from the Florida Insurance Department, but only $7.6 million has been approved).

The Intervening Regulators' States of Maine, Massachusetts and Washington are illustrative of the problem. Since 2009, only Massachusetts has approved a significant percentage of the rate increases sought by SHIP. *See* Ex. RP-53 (showing a 90% approval ratio in Massachusetts but an 11% approval ratio in Maine and a 63% approval ratio in Washington). The Rehabilitator's evidence demonstrated that a liquidation will not alleviate SHIP's premium rate inequities and cross-policyholder subsidization issues.

### 3. Liquidation Involves Inherent Delays

At a minimum, a liquidation would cause a material delay in addressing the policy underpricing which lies at the root of SHIP's insolvency. NOLHGA's actuary testified that in the Penn Treaty liquidation it took six months to a year to

prepare and file the rate applications on behalf of the guaranty associations. It took an additional 15 months to receive decisions from most of the state insurance regulators, with the final state's approval taking more than 4 years. Bodnar testified that the rate approval process can take anywhere from 90 days to 2 years or more. Thus, at best, in a liquidation of SHIP it would take nearly two years to prepare, file and receive approvals on rate increase requests, and there would be no certainty that the rates would be approved at the requested actuarially justified level.

By contrast, the Second Amended Plan can be implemented quickly, thereby addressing the causes of SHIP's financial distress, preserving assets, and reserving flexibility for Phase Two and beyond. Cantilo testified that it would take approximately six months to prepare and transmit election packages to policyholders and gather any Issue State Opt-out elections. Upon implementation of the Plan, the Rehabilitator will know within approximately eight months how much of the Funding Gap will be eliminated. The outcome of Phase One will determine whether Phase Two will be necessary and, if so, its scope. While the self-sustaining premium methodology proposed for Phase Two is actuarially justified according to Bodnar's undisputed expert testimony, the Rehabilitator may consider alternatives as necessary depending on the outcome of Phase One. The Rehabilitator will also provide reports to the Court at the appropriate times with her recommendations regarding Phase Two. A liquidation does not offer this kind of flexibility. *See Mutual Fire I*, 572 A.2d at 803 ("[T]he benefits of rehabilitation – its flexibility and avoidance of inherent delays – are preferable to the static and cumbersome procedures of statutory liquidation.").

47

**4. Policyholders Will Have Fewer Choices in Liquidation**

In a liquidation of SHIP, policyholders will not be offered the choices provided under the Second Amended Plan. NOLHGA's witnesses acknowledged that the benefit modification offers made by the guaranty associations in the Penn Treaty liquidation, which were the first of their kind in a long-term care insurance liquidation, do not match the options offered under the Plan. Specifically, there was no equivalent to the basic policy coverages provided in Option 2/2a. There was no enhanced non-forfeiture option similar to Option 3. There was no option similar to Option 4 that could provide coverage above the applicable guaranty association cap. The Plan provides greater flexibility for policyholders than they would have in liquidation by offering meaningful policy modification alternatives that will also alleviate the Funding Gap and inequitable rate structure.

**C. The Plan Meets the Legal Standards for Confirmation**

**1. The Plan's Rate Approval Mechanism and Issue-State Rate Approval Alternative are Permissible Under Pennsylvania Law and the United States Constitution**

The Intervening Regulators object to the Second Amended Plan for the stated reason that the Plan proposes to have premium rates set by the Rehabilitator and this Court rather than by state-of-issue regulators. Intervening Regulators' Memorandum of Law, 6/14/2021, at 41. The Intervening Regulators assert that the Rehabilitator's power under Article V to "direct and manage" the "property and business of the insurer," Section 516(b) of Article V, 40 P.S. §221.16(b), does not include authority to change "SHIP's policies and rates without required regulatory approvals." Intervening Regulators' Memorandum of Law at 44. They also assert that the Plan's deviation from the ordinary state-by-state rate review process violates

48

the Full Faith and Credit Clause of the United States Constitution[13] and is inconsistent with the principle of comity. The Plan's Issue State Rate Approval Option does not cure these infirmities because it is coercive and offers, at most, a "nominal deference" to the state of issue's authority to regulate the premium rates for policies issued in that state. Intervening Regulators' Memorandum of Law at 50, 52.

We begin with a review of Section 516 of Article V, which sets forth the powers and duties of the Rehabilitator. It states, in pertinent part, as follows:

> (b) *The rehabilitator may take such action as he deems necessary or expedient to correct the condition or conditions which constituted the grounds for the order of the court to rehabilitate the insurer.* He shall have all the powers of the directors, officers and managers, whose authority shall be suspended, except as they are redelegated by the rehabilitator. He shall have full power to direct and manage, to hire and discharge employes subject to any contract rights they may have, and to deal with the property and business of the insurer.
>
> * * *
>
> (d) The rehabilitator may prepare a plan for the reorganization, consolidation, conversion, reinsurance, merger or other transformation of the insurer. Upon application of the rehabilitator for approval of the plan, and after such notice and hearing as the court may prescribe, the court may either approve or disapprove the plan proposed, or may modify it and approve

---

[13] It states:

Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State. And the Congress may by general Laws prescribe the Manner in which such Acts, Records and Proceedings shall be proved, and the Effect thereof.

U.S. CONST. art. IV, §1. A statute is a "public Act" within the meaning of the Full Faith and Credit Clause. *Franchise Tax Board of California v. Hyatt*, 136 S.Ct. 1277, 1281 (2016) (*Hyatt II*) (citing *Carroll v. Lanza*, 349 U.S. 411, 412 (1955)).

it as modified. If it is approved, the rehabilitator shall carry out the plan. In the case of a life insurer, the plan proposed may include the imposition of liens upon the equities of policyholders of the company, provided that all rights of shareholders are first relinquished. A plan for a life insurer may also propose imposition of a moratorium upon loan and cash surrender rights under policies, for such period and to such an extent as may be necessary.

40 P.S. §221.16(b)(d) (emphasis added).

The Rehabilitator may "take such action as [she] deems necessary or expedient to correct the condition" that caused the need for rehabilitation, 40 P.S. §221.16(b), and in doing so, she may prepare a rehabilitation plan to "*impair the contractual rights of some policyholders* in order to minimize the potential harm to all of the affected parties." *Consedine v. Penn Treaty Network American Insurance Co.*, 63 A.3d 368, 452 (Pa. Cmwlth. 2012) (*Penn Treaty*) (citing *Mutual Fire II*, 614 A.2d at 1094) (emphasis added). This authority includes a reduction of coverage to match the policyholder's existing premium. It has long been understood that the legislature has vested the Rehabilitator with broad discretion in proposing a rehabilitation plan. *Mutual Fire I*, 572 A.2d at 804, *affirmed*, *Mutual Fire II*, 614 A.2d at 1086 (observing that the insurance commissioner, as statutory rehabilitator of an insurer, is given broader discretion to structure a rehabilitation plan than is given to a statutory liquidator).

In the *Mutual Fire* rehabilitation, the plan amended the policyholders' contractual right to full payment on covered claims by reducing all claim payments by an equal percentage. Here, the Rehabilitator could have done something similar by reducing the coverage of each policy to match the premium being paid. This would equitably address the Funding Gap. However, this would not give

50

policyholders a choice. Further, policyholders whose premium is very inadequate might find themselves with a policy with very limited coverage.

*Mutual Fire* was a different receivership. There, the policies lapsed during the rehabilitation, and the sole object of the rehabilitation was to pay outstanding claims to the fullest extent possible. By contrast, here, the SHIP policies are still in force and will remain in force until SHIP emerges from rehabilitation. In this respect, SHIP's rehabilitation is more complex.

A core cause of SHIP's insolvency is policy underpricing, and the Rehabilitator proposes to "correct the condition" through a combination of benefit modifications and premium rate increases. Section 516(b) of Article V, 40 P.S. §221.16(b). Policyholders will be able to decide which of the four options offered under the Second Amended Plan best fits their individual circumstances. The Plan follows the principles of *Mutual Fire I* and *II* and extends them to a different context, as appropriate for a long-term care insurer. The Plan falls within the Rehabilitator's "broad powers … to effectuate equitably the intent of the Rehabilitation statutes." *Mutual Fire II*, 614 A.2d at 1094. The Plan's mechanism for setting actuarially justified rates also falls within the Rehabilitator's broad powers, and they will be reviewed by the Court as part of the rehabilitation proceeding.

Arguably, the only contract "right" given up by the SHIP policyholder is the expectation that the state where the policy was issued will approve the premium rate for each of the four options in Phase One. No policyholder commented on this "right" to state-by-state rate regulation. Policyholder Rose Marie Knight expressed concern about the fact that her premium had not been increased for years. N.T., 5/21/2021, at 933.

The Intervening Regulators assert that the Plan's rate approval provisions "override the insurance laws of other [s]tates" and, thus, violate the Full Faith and Credit Clause of the United States Constitution. Intervening Regulators' Memorandum of Law at 38. Alternatively, the Intervening Regulators contend that this Court should refrain from approving the Plan under the principle of comity because the Plan's "displacement of the rate setting authority of the individual [s]tates" is a "blatant intrusion" on the sovereignty of other states. Intervening Regulators' Memorandum of Law at 49. The Court finds no merit to these arguments.

Article V empowers this Court to rehabilitate the business of "a domestic insurer or an alien insurer domiciled in this Commonwealth." Section 515(a) of Article V, 40 P.S. §221.15(a). As a general rule, the insolvent insurer's state of domicile "has an overriding interest in assuring that the rehabilitation, if possible, is effectuated." *Matter of Mutual Benefit Life Insurance Co.*, 609 A.2d 768, 777 (N.J. Super. 1992). The court's "decree approving the rehabilitation plan for an insolvent insurer domiciled in its state has a *res judicata* effect upon out-of-state policyholders so as to preclude a subsequent attack upon the plan in another state." 1 COUCH ON INSURANCE 3d §5:31.

Maine, Massachusetts, and Washington have adopted, in substantial part, the Uniform Insurers Liquidation Act (UILA),[14] which was approved by the National Conference of Commissioners on Uniform State Laws in 1939. The UILA addressed the difficulties that arise in the receivership of an insolvent insurer with assets and liabilities located in several states; the UILA provides a "uniform system

---

[14] *See* 24-A Me. Stat. Ann. §4363; *In re Liquidation of American Mutual Liberty Insurance Company*, 747 N.E.2d 1215, 1225 n.13 (Mass. 2001); and *American Star Insurance Co. v. Grice*, 865 P.2d 507, 509 (Wash. 1994).

for the orderly and equitable administration of the assets and liabilities of defunct multistate insurers." *Altman v. Kyler*, 221 A.3d 687, 692 n.6 (Pa. Cmwlth. 2019) (quotations omitted). Pennsylvania, on the other hand, adopted the Insurer's Supervision, Rehabilitation and Liquidation Model Act (Model Act) approved by the National Association of Insurance Commissioners. *See Koken v. Reliance Insurance Co.*, 893 A.2d 70, 76 (Pa. 2006). Following the Model Act, Article V addresses "the problems of interstate rehabilitation and liquidation by facilitating cooperation between states in the liquidation process, and by extending the scope of personal jurisdiction over debtors of the insurer outside this Commonwealth." Section 501(c) of Article V, 40 P.S. §221.1(c).

Because Maine, Massachusetts, and Washington have adopted the UILA and Pennsylvania has adopted the similar Model Act, a single, cohesive, uniform handling of SHIP's rehabilitation through a single state is consistent with those laws. Notably, the laws of Maine, Massachusetts and Washington also designate the domiciliary insurance commissioner as the receiver of an insurer undergoing liquidation or rehabilitation.[15] The Intervening Regulators have presented no reason to set aside Pennsylvania's primacy in SHIP's receivership.

Nor does the Full Faith and Credit Clause require this Court to apply the insurance rate regulatory laws of Maine, Massachusetts, and Washington with respect to the establishment of the If Knew Premium rate in the Second Amended Plan. The purpose of the full faith and credit command

> was to alter the status of the several states as independent foreign sovereignties, each free to ignore obligations created under the laws or by the judicial proceedings of the others, and to make them integral parts of a single nation throughout which a remedy

---

[15] *See* 24-A Me. Stat. Ann. §4364; Mass. Gen. Laws Ann. 175 §180B; Wash. Rev. Code §48.99.020.

53

> upon a just obligation might be demanded as of right, irrespective of the state of its origin.

*Baker by Thomas v. General Motors Corporation*, 522 U.S. 222, 232 (1998) (citation omitted). Congress' Full Faith and Credit Act[16] requires that "all courts ... treat a state court judgment with the same respect that it would receive in the courts of the rendering state." *Standard Chartered Bank v. Ahmad Hamad Al Gosaibi and Brothers Co.*, 99 A.3d 936, 941 (Pa. Super. 2014) (citing *Matsushita Electric Industrial Co. v. Epstein*, 516 U.S. 367, 373 (1996)).

The relevant precedent differentiates between the credit owed to *laws* and the credit owed to *judgments* under the Full Faith and Credit Clause. *Baker*, 522 U.S. at 232. The Full Faith and Credit Clause "does not compel a state to substitute the statutes of other states for its own statutes dealing with a subject matter [] which it is competent to legislate." *Id*. (citation omitted). Instead, "it is frequently the case under the Full Faith and Credit Clause that a court can lawfully apply either the law of one State or the contrary law of another." *Franchise Tax Board of California v. Hyatt*, 538 U.S. 488, 496 (2003) (*Hyatt I*). By contrast, "[a] final judgment in one State, if rendered by a court with adjudicatory authority over the subject matter and persons governed by the judgment, qualifies for recognition throughout the land." *Baker*, 522 U.S. at 233. A court may be guided by the forum state's public policy

---

[16] It provides:

> Such Acts, records and judicial proceedings or copies thereof, so authenticated, shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken.

28 U.S.C. §1738.

Likewise, the Pennsylvania legislature has enacted the Uniform Enforcement of Foreign Judgments Act, which defines "foreign judgment" as "any judgment, decree, or order of a court of the United States or of any other court requiring the payment of money which is entitled to full faith and credit in this Commonwealth." 42 Pa. C.S. §4306.

in determining the law applicable to a controversy, but there is no "public policy exception" to the full faith and credit due a court's judgment. *Id*. at 233.

At issue here is whether the Second Amended Plan, if approved by this Court, would give full faith and credit to the insurance laws of Maine, Massachusetts, and Washington. The Court concludes that it would.

In *Carroll v. Lanza*, 349 U.S. 411 (1955), the United States Supreme Court considered a negligence action brought by a Missouri worker against a general contractor in Arkansas, where he sustained injuries. Both Missouri and Arkansas had enacted a workers' compensation law that provided the exclusive remedy of the employee for a work-related injury. The Arkansas law, however, also allowed the injured employee to pursue common-law tort claims against a third party. The Supreme Court held that the Full Faith and Credit Clause did not make Missouri's statute a bar to enforcement of Arkansas' law. Arkansas had sufficient grounds to apply its own law because of its interest in protecting persons injured within its borders and, thus, "opened its courts to negligence suits against prime contractors, refusing to make relief by way of workmen's compensation the exclusive remedy." *Id*. at 412-13. In sum, Missouri law (compared with Arkansas Law) embodied "a conflicting and opposed policy," and Arkansas law did not embody "any policy of hostility to the public Acts of Missouri." *Id.* at 413.

Likewise, in *Hyatt I*, 538 U.S. 488, a former California resident who had moved to Nevada brought tort actions in Nevada state court against the California franchise tax board, alleging negligent misrepresentation, invasion of privacy, fraud, and other torts in connection with the board's assessments and penalties for taxes he allegedly owed. The Nevada Supreme Court applied Nevada law, which gave state agencies immunity for negligence but not for intentional torts.

Accordingly, the Nevada Supreme Court ordered the trial court to dismiss the negligence claim for lack of jurisdiction but allowed the intentional tort claims to proceed to trial. The tax board appealed.

The United States Supreme Court upheld the Nevada Supreme Court's decision. The Court emphasized that the Full Faith and Credit Clause does not require one state to apply another state's law that violates its "own legitimate public policy." *Id.* at 497 (internal quotations omitted). Nevada's choice of law in that case did not "exhibi[t] a policy of hostility to the public Acts of a sister State." *Id.* at 499 (citing *Carroll*, 349 U.S. at 413). Further, Nevada had "sensitively applied principles of comity with a healthy regard for California's sovereign status" by "relying on the contours of Nevada's own sovereign immunity from suit as a benchmark for its analysis." *Id.* at 499.

Following remand, a jury found in the taxpayer's favor and awarded him almost $500 million in damages and fees. The tax board again appealed to the Nevada Supreme Court, arguing that the Full Faith and Credit Clause required Nevada to limit damages to $50,000, the maximum that Nevada law would permit in a similar suit against its own agencies. The Nevada Supreme Court affirmed $1 million of the award. Instead of applying the Nevada statute applicable to suits against Nevada's own agencies, the Nevada Supreme Court applied a special rule for one case. On further appeal, the United States Supreme Court held that this decision of the Nevada Supreme Court violated the Full Faith and Credit Clause because it lacked the "healthy regard for California's sovereign status" and "reflect[ed] a constitutionally impermissible policy of hostility to the public Acts of a sister State." *Franchise Tax Board of California v. Hyatt*, 136 S.Ct. 1277, 1282-83 (2016) (*Hyatt II)* (citation omitted).

In the case *sub judice*, the evidence demonstrated that the Rehabilitator will use the If Knew Premium methodology in the implementation of the Plan. This methodology will assume a 60% lifetime loss ratio, which is the benchmark for a premium rate increase in Pennsylvania and most other states. The If Knew Premium methodology is used by insurance regulators nationwide to set long-term care insurance premium rates. The self-sustaining premium to be implemented in Phase Two of the Plan will likewise use a 60% lifetime loss ratio. *See* 31 Pa. Code §89a.117 ("Benefits under long-term care insurance policies shall be deemed reasonable in relation to premiums provided the expected loss ratio is at least 60% [.]").

A review of the insurance statutes of Maine, Massachusetts, and Washington shows that these sister states share Pennsylvania's interest in ensuring that long-term care insurance premium rates are not excessive, unfairly discriminatory, or unreasonable in relation to the benefits provided under the policy.[17] This commonly-shared interest will be advanced, rather than impaired, by the Second Amended Plan, which seeks to correct SHIP's discriminatory premium rate structure; sets the premium rates to appropriate levels; and employs the If Knew

_____

[17] The Maine Insurance Code requires that the state insurance regulator determine that the rate filings on health insurance policies comply with "the requirements that rates not be excessive, inadequate or unfairly discriminatory." 24-A Me. Stat. Ann. §2736. The insurance statute in Massachusetts provides that the insurance commissioner may "disapprove such form of policy if the benefits provided therein are unreasonable in relation to the premium charged, or if it contains any provision which is unjust, unfair, inequitable, misleading or deceptive, or which encourages misrepresentation as to such policy[.]" Mass. Gen. Laws Ann. Ch. 175 §108(8)(A). Likewise, the insurance statute in Washington provides that long-term care insurance rate increases are not permitted "if the benefits provided therein are unreasonable in relation to the premium charged." Wash. Rev. Code §48.18.110. These standards are similar to the Pennsylvania standard for adjusting long-term care insurance premium rates. *See* Section 353 of The Insurance Company Law of 1921, Act of May 17, 1921, P.L. 682, *as amended*, *added by* the Act of June 23, 1931, P.L. 904, 40 P.S. §477a.

Premium methodology to establish a premium level that is reasonable in relation to the benefits paid.

Alternatively, under an Issue-State Rate Approval Option, a state may opt out of the rate approval section in the Plan. If a state opts out, the Rehabilitator will file an application to increase rates for policies issued in that state to the If Knew Premium level. The regulator for the opt-out state will render a decision on the Rehabilitator's rate increase application; if it is only partially approved, the Rehabilitator will downgrade the benefits under the affected policies accordingly. Cantilo testified that policyholders in an opt-out state will still have four options, although they are not exactly the same as those offered in the Second Amended Plan. This does not render the Issue-State Rate Approval Option "coercive" or "nominal," as the Intervening Regulators assert; rather, it provides the issue state with a meaningful way to control the mix of benefit reductions and premium rate increases. It prevents the opt-out state from interfering with Pennsylvania's ability to rehabilitate SHIP. In sum, the Second Amended Plan gives a "healthy regard" for the insurance laws of other states by "relying on the contours of [Pennsylvania insurance law] as a benchmark for its analysis." *Hyatt I*, 538 U.S. at 499.

The Second Amended Plan does not follow the ordinary rate review process for a solvent insurer, but it preserves the substantive rights of SHIP's policyholders to have their premium reviewed by a qualified actuary and an insurance regulator to ensure that the rate is actuarially justified and reasonable in relation to the benefits. The Plan changes the forum for the premium determinations to the state responsible for the rehabilitation of SHIP, *i.e.*, Pennsylvania. The conflict between Pennsylvania law and the laws of Maine, Massachusetts, and Washington, if any, is one of procedure, to which this Court owes no deference. *See*

58

*Wilson v. Transport. Ins. Co.*, 889 A.2d 563, 571 (Pa. Super. 2005) (citation omitted) (the "choice of law" analysis applies only to conflicts of substantive law, which "creates the rights and duties of the parties to a judicial proceeding").

The insistence of the Intervening Regulators that the Rehabilitator submit rate increase applications to 46 states, the District of Columbia, and the U.S. Virgin Islands renders a rehabilitation of SHIP an impossibility. Pennsylvania has a compelling interest in enforcing Article V, which protects "the interests of insureds, creditors, and the public generally" through

> *(i) early detection of any potentially dangerous condition in an insurer, and prompt application of appropriate corrective measures; (ii) improved methods for rehabilitating insurers, involving the cooperation and management expertise of the insurance industry;* (iii) enhanced efficiency and economy of liquidation, through clarification and specification of the law, to minimize legal uncertainty and litigation; *(iv) equitable apportionment of any unavoidable loss;* (v) lessening the problems of interstate rehabilitation and liquidation by facilitating cooperation between states in the liquidation process, and by extending the scope of personal jurisdiction over debtors of the insurer outside this Commonwealth; and (vi) regulation of the insurance business by the impact of the law relating to delinquency procedures and substantive rules on the entire insurance business.

Section 501(c) of Article V, 40 P.S. §221.1(c) (emphasis added).[18] Furthermore, as this Court observed in *Mutual Fire I*,

> the benefits of rehabilitation—its flexibility and avoidance of inherent delays—are preferable to the static and cumbersome procedures of statutory liquidation. The statute's purpose is, in the end, that to which we must give effect. That legislatively

---

[18] Section 501(b) of Article V states that its provisions "shall be liberally construed to effect the purpose stated in subsection (c)." 40 P.S. §221.1(b).

> stated purpose is "the protection of the interests of insureds, creditors, and the public generally...." and the "equitable apportionment of any unavoidable loss" through, *inter alia*, "improved methods for rehabilitating insurers...." Section 501 of the Act, 40 P.S. §221.1. No interest is served by adding to the delay which has already occurred in this case. On the contrary, the goals of Article V of the Act are better served by a rehabilitation which effectively ensures more distribution in a shorter period of time than would occur in liquidation.

572 A.2d at 803.

Here, the evidence established that the ordinary rate filing process often involves 6 to 12 months of preparation and years of review in some states. "No interest is served by adding to the delay which has already occurred in this case." *Mutual Fire I*, 572 A.2d at 803. Further, a state-by-state rate filing process would not address the inconsistent rate approvals from state insurance regulators, which leave SHIP with less revenue than needed and similarly situated policyholders paying vastly different premiums for the same coverage. Cantilo credibly testified that the Plan's premium rate methodologies and approval mechanisms are necessary to address the inequities in SHIP's current rate structure. The use of the If Knew Premium across all policies will put all policyholders on a level playing field because it is calculated on a seriatim basis.

In sum, under Article V, the Rehabilitator has the authority to propose, and this Court has the authority to approve, the Second Amended Plan's provisions regarding the establishment of premium rates for the four policyholder options in Phase One. The Full Faith and Credit Clause does not require the Rehabilitator to submit these premium rates to 46 states, the District of Columbia, and the U.S. Virgin Islands for their review and approval. This would fracture Pennsylvania's "own legitimate public policy" in the rehabilitation of SHIP, a Pennsylvania-

domiciled insurer. *Hyatt I*, 538 U.S. at 497. In no way does this aspect of the Second Amended Plan reflect "a policy of hostility to the public Acts of a sister State." *Id.* at 499. To the contrary, the interests of Maine, Massachusetts, and Washington in ensuring that long-term care insurance premium rates are not excessive, unfairly discriminatory, or unreasonable to the benefits provided will be advanced, rather than impaired, by the Plan.

Finally, the Court rejects the Intervening Regulators' arguments on comity. Application of comity is "a matter of judicial discretion," and Pennsylvania courts exercise comity "when application of another state's law contradicts no public policy of Pennsylvania and instead furthers a Pennsylvania policy." *Chestnut v. Pediatric Homecare of America, Inc.*, 617 A.2d 347, 350 (Pa. Super. 1992). The Plan has "sensitively applied principles of comity with a healthy regard" for the insurance laws of other states by "relying on the contours of [Pennsylvania insurance law] as a benchmark for its analysis." *Hyatt I*, 538 U.S. at 499.

Once this Court renders a judgment on the Second Amended Plan, it is Maine, Massachusetts, and Washington that owe this Court's judgment full faith and credit. *See Underwriters National Assurance Co. v. North Carolina Life and Accident and Health Insurance Guaranty Association*, 455 U.S. 691 (1982). *See also* 1 COUCH ON INSURANCE 3d §5:31 (discussing state court's violation of Full Faith and Credit Clause by refusing to treat prior judgment of another state's insurance rehabilitation court as *res judicata*).

## 2. The Plan Satisfies all Constitutional Requirements

The Intervening State Insurance Regulators argue that the Second Amended Plan is unconstitutional because it does not satisfy the standard that "[c]reditors and policyholders must fare at least as well under a rehabilitation plan

61

as they would under a liquidation." *Koken v. Fidelity Mutual Life Insurance Co.*, 803 A.2d 807, 826 (Pa. Cmwlth. 2002) (citing *Neblett v. Carpenter*, 305 U.S. 297 (1938)). In applying the *Carpenter* standard, this Court is guided by the three-part test adopted in *Mutual Fire II*.[19] The "threshold inquiry" is whether the state action "has operated to substantially impair a contractual relationship" in violation of Article I, Section 10 of the United States Constitution and Article I, Section 17 of the Pennsylvania Constitution.[20] *Mutual Fire II*, 614 A.2d at 1094 n.4. An impairment of contractual rights is not a *per se* violation of law. *Id*. If a particular policyholder is found to be worse off under a rehabilitation plan, the impairment could be considered "substantial," but the Court still needs to determine whether (1) the rehabilitator has acted for a legitimate and significant public purpose and (2) the adjustment of contractual rights is reasonable and of a nature appropriate to that public purpose. *Id*. To that end, the Court must be mindful that Article V is intended to protect "the interests of insureds, creditors, and the public generally[.]" Section 501(c) of Article V, 40 P.S. §221.1(c).

### i. The Plan Satisfies Pennsylvania's Interpretation of *Carpenter*

Under the so-called "*Carpenter* test," a rehabilitation plan should be confirmed if creditors will fare at least as well under the plan as they would in liquidation. *Mutual Fire II*, 614 A.2d at 1093-94. As our Supreme Court has

---

[19] Several of the objectors to the Mutual Fire rehabilitation plan argued that the plan impaired their contractual rights. In analyzing their argument, our Supreme Court expressly adopted the three-part test announced by the United States Supreme Court in *Energy Reserves Group, Inc. v. Kansas Power and Light Co.*, 459 U.S. 400, 411 (1983), for determining when a state law may impair a contractual right. *Mutual Fire II*, 614 A.2d at 1094 n.4. Thus, whether an alleged contractual impairment is caused by a receiver's workout plan or a statute, the analysis is the same.

[20] Article I, Section 10 of the United States Constitution states, in pertinent part: "No State shall … pass any … Law impairing the Obligation of Contracts[.]" U.S. CONST. art. 1, §10. Article I, Section 17 of the Pennsylvania Constitution states: "No … law impairing the obligation of contracts … shall be passed." PA. CONST. art. I, §17.

explained, this does not mean that every single policyholder must satisfy that test. *See id*. at 1102 ("individual interests might have to be sacrificed or compromised in order to preserve the ultimate goal of [the rehabilitation] process[.]"); *see also Penn Treaty*, 63 A.3d at 453 ("[*Carpenter*] did not establish the broad principle that a rehabilitation plan is *per se* invalid unless every policyholder will fare as well in rehabilitation as in liquidation."). Instead, the Court is guided by the three-part test established by *Mutual Fire II. Penn Treaty*, 63 A.3d at 453.

Under that test, if a particular policyholder is found to be worse off under a rehabilitation plan than in liquidation, and that impairment is "substantial," the Court should confirm the plan so long as the Rehabilitator has acted for a legitimate and significant public purpose and the contractual modification is reasonable and appropriate to that public purpose. *Id.* In this regard, "[t]he Court must consider the greater good, including the consequences to the larger class of policyholders and the taxpaying public." *Id.* (citing *Vickodil v. Insurance Department*, 559 A.2d 1010, 1013 (Pa. Cmwlth. 1989)).

The Second Amended Plan meets that test. Even assuming, *arguendo*, that the Plan substantially impairs policies, it serves a legitimate and significant public purpose, and the policy modifications are reasonable and appropriate to that purpose. At the hearing, Special Deputy Rehabilitator Cantilo aptly observed:

> And the question that we were debating [was], is it reasonable, if a policyholder has been paying a quarter for a dollar's worth of insurance for decades, to adopt, as the workout plan, a plan in which the taxpayers step up to pay their remaining 75 cents.
>
> And what we concluded is that we could right size the policy, and we could create a set of options for policyholders that would enable them to get fundamental [long term care] coverage but pay reasonable rates like the rest of the country for that coverage and not shift all that burden to the taxpayers.

63

N.T., 5/17/2021, at 78-79.  In short, the Plan narrows the Funding Gap, promotes fairness and equity among policyholders, and appropriately balances the interests of the policyholders and the broader taxpaying public.

### ii. The Intervening Regulators' Interpretation of *Carpenter* is Flawed

The Intervening Regulators urge a rigid application of *Carpenter*, *i.e.*, that all policyholders must fare as well in rehabilitation as they would in liquidation. To that end, the Intervening Regulators compared the net present value of the benefits policyholders will receive under the Second Amended Plan with the net present value of the benefits they can expect to receive in a liquidation.  Notably, the Court in *Carpenter* was comparing the cash payment to policyholders under a rehabilitation plan with the cash payment they would receive in a liquidation, at a time when there was no guaranty association protection for policyholders.[21]  Here, the alternatives are not cash payments but continued insurance coverage.  The value comparison of coverage to SHIP policyholders in a rehabilitation as compared to a liquidation cannot be reduced to dollar amounts.

The Intervening Regulators' metric is one not actually used by policyholders when making the decision to purchase long-term care insurance.  As testimony from Cantilo and Bodnar established, consumers choose their policy benefits and limits according to their personal circumstances.  For example, a

---

[21] The judicially created requirement that a rehabilitation must treat policyholders better than would a liquidation pre-dates the creation of guaranty associations.  Arguably, guaranty association protection should not be part of that analysis because the associations exist as a matter of legislative grace.  Legislatures can repeal the guaranty association statutes or reduce the benefit caps.  As it is, there is commonality but not uniformity.  In any event, the existence of guaranty association protection was part of the Rehabilitator's analysis and, practically speaking, that protection cannot be ignored.  Nor can its cost to other stakeholders, *i.e.,* policyholders of the guaranty associations' member insurers and taxpayers.

policyholder may wish to protect his estate against dissipation by an extended stay in a nursing home. Each policyholder will have different goals and different financial situations that will affect the type and amount of coverage they purchase. Not a single witness testified that the liquidation value of a policy figures into this analysis. Cantilo and Bodnar opined that the comparison methodology policyholders use is the maximum policy value, not the *Carpenter* value. Cantilo provided compelling examples of actual SHIP policyholders whose *Carpenter* value, using the Intervening Regulators' proposed net present value metric, would, in fact, produce a poor option for that policyholder. *See* Ex. RP-56 at 102-03. The Court credits Cantilo's statement that "[t]here are many cases where the raw projection of future benefits less future premiums [doesn't] really tell you what the real value of the policy is." N.T., 5/17/2021, at 177.

In any event, even under the Intervening Regulators' metric, 85% of SHIP policyholders will be offered one option with a value equal to or higher than the value of the policy they will have in liquidation. Several other metrics produced even higher percentages of policyholders who will fare at least as well under the Plan as in liquidation.

### 3. The Plan is Feasible to the Extent Required by Pennsylvania Law

The Intervening Regulators argue that the Second Amended Plan is not feasible because it is unlikely to eliminate the Funding Gap and restore SHIP to solvency. To begin, there is no statutory requirement in Pennsylvania that a rehabilitation plan must be "feasible" in order to be approved, nor has that standard been adopted in our decisional law. The only reference to feasibility anywhere in Pennsylvania law occurred in the Mutual Fire receivership during the implementation of an already approved rehabilitation plan. *Mutual Fire II*, 614 A.2d

1086. The Intervening Regulators have not cited any other case in which "feasibility" appears. Notably, in *Mutual Fire*, the rehabilitator raised "feasibility" to support a request to modify the Court-approved rehabilitation plan. *Id*. at 1090. The Intervening Regulators' attempt to read a non-existent pre-approval "feasibility" requirement into Article V has no support in *Mutual Fire II*.

The Intervening Regulators argue that a "feasible" rehabilitation plan must be "reasonably likely to succeed in restoring the company to solvency" in order to be approved. Intervening Regulators' Post-Hearing Memorandum at 5.

First, the Court notes that the meaning of "company solvency" is context specific. The peak of SHIP's activity in the insurance marketplace was in the late 1990s, when it had more than 300,000 policies in force. N.T., 5/17/2021, at 40; Ex. RP-56 at 18. By 2003, when SHIP discontinued writing new business and went into run-off, the number of policies in force was already in a steep decline. *Id.* The Second Amended Plan, if successful, will restore SHIP to what it was pre-receivership, *i.e.*, an insurer winding down its long-term care insurance business and able, as a going concern, to continue coverage and pay the claims of its existing policies. The Court rejects the Intervening Regulators' suggestion that a return to solvency by SHIP requires more than a return to its pre-receivership status. SHIP had long ceased being an active and growing presence in the insurance marketplace.

Second, the Pennsylvania Supreme Court has stated that "[s]o long as the rehabilitation properly conserves and equitably administers 'the assets of the involved [insurer] in the interest of investors, the public and others, (with) the main purpose being the public good' the plan … is appropriate." *Mutual Fire II*, 614 A.2d at 1094 (quoting 2A COUCH ON INSURANCE 2d §22.10). Simply, the Court rejected

the notion that a rehabilitation plan must contemplate a resuscitation of the insolvent insurer's operations.

Under any outcome, the Second Amended Plan will materially reduce the Funding Gap and significantly improve SHIP's financial condition. The Intervening Regulators offered no substantive evidence to overcome the Rehabilitator's evidence on this issue. The Intervening Regulators correctly point out that the ultimate goal of the Mutual Fire rehabilitation plan was to restore the company to solvency. The Second Amended Plan has, as its ultimate goal, SHIP's return to solvency. It "does not have to restore the company to its exact original condition." *Mutual Fire II*, 614 A.2d at 1094.

Further, as a matter of public policy the rehabilitation of an insurer, where possible, is the preferred course. *Penn Treaty*, 63 A.3d at 440 (recognizing liquidation as a remedy of last resort); *Koken v. Legion Insurance Co.*, 831 A.2d 1196, 1230 (Pa. Cmwlth. 2003) (same); and *Mutual Fire II*, 614 A.2d at 1094 (same). As this Court explained, "a liquidation, no matter how 'successful,' is certain to cause harm to the policyholders, creditors and taxpaying public[.]" *Penn Treaty*, 63 A.3d at 461.

In summary, Article V does not require the Second Amended Plan be "feasible" in order to be approved, and the Intervening Regulators' arguments to the contrary simply voice a disagreement with the Rehabilitator's exercise of discretion. The Plan will eliminate or reduce the Funding Gap, which is a legitimate purpose. The ultimate goal of the Second Amended Plan is to return SHIP to the level of solvency needed to run-off its long-term care insurance business.

### 4. The Plan is Fair and Equitable

As stated, SHIP's current premium rate structure is unfairly discriminatory because policyholders with substantially similar coverage are not paying the same premium, thereby burdening some policyholders with subsidizing the premium payments of other policyholders. This Court has recognized that eliminating these unfair "subsidies between policyholders in different states and between different groups of policyholders" is itself a legitimate goal of rehabilitation. *Penn Treaty*, 63 A.3d at 443, 460.

The Intervening Regulators argue that unless the Plan maintains SHIP's current unequal treatment of policyholders on a state-by-state basis, then the Plan is unlawful. The Intervening Regulators' position fails for several reasons.

First, the Intervening Regulators lack standing to assert the claim that the Plan treats "policyholders in different States differently." Intervening Regulators' Post-Hearing Memorandum at 32. They expressly disavowed that they were appearing in a *parens patriae* or other representative capacity for policyholders in their states. N.T., 5/19/2021, at 541-47. Even so, the Intervening Regulators failed to present any evidence showing how policyholders in their respective states would be unfairly treated by the Plan's proposal to eliminate unfair subsidies between groups of policyholders.

Second, the Plan will end the existing unequal treatment of similarly situated policyholders. The Intervening Regulators strain to characterize some policyholders as receiving "more" by "suffering smaller benefit cuts" when compared to other policyholders receiving "less" by "suffering greater benefit cuts." Intervening Regulators' Post-Hearing Memorandum at 38. This is a function of the fact that many policyholders presently pay an inadequate premium. The Court

68

rejects the Intervening Regulators' characterization of right sizing premium to policy coverage as itself an act of unequal treatment.

To eliminate the unfair subsidies between policyholders, the change in rates or coverages will have a greater impact on the more underpriced (and over-subsidized) policies that have benefited at the expense of other policyholders. The Plan will require similarly situated policyholders to pay the same premium for the same coverage. The Plan's elimination of unfair subsidies between policyholders aligns with this Court's precedent in the Penn Treaty receivership, which recognized that a rehabilitation plan may properly eliminate such subsidies. *Penn Treaty*, 63 A.3d at 443, 460.

Third, the Intervening Regulators improperly invoke Section 544(b) of Article V, 40 P.S. §221.44(b), which states that no subclasses may be created within the policyholder class in a liquidation. As a threshold matter, this is a rehabilitation, not a liquidation. More fundamentally, the Plan does not give "some policyholders greater consideration than others." Intervening Regulators' Post-Hearing Memorandum at 35. To the contrary, the Second Amended Plan treats similarly situated policyholders the same regardless of the state in which their policy was issued.

### D. Other Concerns and Objections Raised at the Hearing are Overruled or Have Been Adequately Addressed

### 1. Intervening Regulators' Application for Reconsideration

At the close of the hearing on May 21, 2021, this Court granted the Rehabilitator's oral motion "for judgment in the nature of a directed verdict" against the Intervening Regulators regarding the Issue State Rate Approval Option in the Second Amended Plan. N.T., 5/21/2021, at 981. The Rehabilitator argued that the Intervening Regulators did not present any evidence that their interests would be

harmed by the Issue State Rate Approval Option, and as such, their objection to the Issue State Rate Approval Option cannot serve as a basis for this Court to disapprove the Plan. *Id*. at 986-88.

On June 1, 2021, the Intervening Regulators filed an application for reconsideration for the stated reason that the Rehabilitator's motion was vague, was made without notice and lacked support in the applicable court rules. More specifically, the Intervening Regulators contend that the term "[I]ssue [S]tate [R]ate [A]pproval [O]ption" is not "meaningful," as "it is impossible to tell" whether it was referring to the "opt-out" provision under the Second Amended Plan. Application for Reconsideration at 7. They also contend that a motion for a directed verdict can be filed only in a "jury case" or an "adversarial proceeding," which is not the case here. *Id*. at 8, 12. Even so, to grant a motion for a directed verdict requires this Court to consider "all of the evidence before it in the light most favorable to the [Intervening] Regulators." *Id.* at 14. They assert that the Rehabilitator's motion "[f]ails on the [r]ecord" because Cantilo and Bodnar testified that the Plan seeks to "supersede the existing state rate approval system," which would impact state regulators and policyholders. *Id*. at 14-15. The Intervening Regulators' arguments are not persuasive.

To begin, the Rehabilitator's motion for a directed verdict was not vague. In moving for a directed verdict, the Rehabilitator's counsel stated that "the [Intervening Regulators] have failed to put on any evidence which would or could support an interest they purport to represent with respect to the issue[] state rate approval option." N.T., 5/21/2021, at 981-82. Counsel went on to assert that "absent any testimony as to the ways in which a regulator is constrained or harmed by that option, the [Intervening Regulators] here have no argument to present which would

70

show that [the option] does not sufficiently address the concerns that they have raised at some earlier stage in these proceedings." *Id*. at 986. The Intervening Regulators objected to the motion for the reason that granting a directed verdict would be improper under the circumstances as the case presents "significant open legal issues." *Id*. at 989. The Rehabilitator's counsel responded:

> To be clear, we're only seeking the directed verdict on the [I]ssue [S]tate [R]ate [A]pproval [O]ption issue. I don't have here where it was raised in the memorandum. We're not seeking a directed verdict as to, generally, the questions of whether the [P]lan is fair and equitable or the exercise of the [R]ehabilitator's discretion generally. This is a narrow motion, Your Honor, on the [I]ssue [S]tate [R]ate [A]pproval [O]ption and the opt-out offer thereunder[.]

*Id*. at 991.

After hearing arguments from both parties, the Court granted the motion. It stated that "there is an opt-out option that preserves the right of the [] … state of issue to pursue a state rate approval powers and [Intervening Regulators'] witness did not address why the [P]lan was deficient … in that way." *Id*. at 994. In short, the motion was not vague.

This Court also rejects the Intervening Regulators' argument that the Rehabilitator's motion for a directed verdict lacked due notice. The Intervening Regulators do not cite, and this Court did not find, any legal authority which would have required such notice. The Rehabilitator did not need to disclose her litigation strategy at the hearing with the Intervening Regulators. In any event, the Intervening Regulators were given an opportunity to file with this Court an application for reconsideration, which they did on June 1, 2021.

71

Nor did the Intervening Regulators cite any legal authority to support their proposition that a directed verdict can only be entered in a jury trial. Notably, the Intervening Regulators' proposition is at odds with their earlier position that this Court should have ruled on the legal issues before holding an evidentiary hearing on the Second Amended Plan.

> Pennsylvania Rule of Appellate Procedure 106 provides:
>
> Unless otherwise prescribed by these rules the practice and procedure in matters brought before an appellate court within its original jurisdiction shall be in accordance with the appropriate general rules applicable to practice and procedure in the courts of common pleas, so far as they may be applied.

PA. R.A.P. 106. However, the Intervening Regulators point to Pennsylvania Rule of Appellate Procedure 3783(b), which provides that "[t]he Pennsylvania Rules of Civil Procedure shall apply to adversarial proceedings."[22] PA. R.A.P. 3783(b). Because an action to rehabilitate an insurer pursuant to Article V is a "formal proceeding," not an "adversarial proceeding," PA. R.A.P. 3772(f), the Intervening Regulators argue that it is not subject to the Rules of Civil Procedure.

The Intervening Regulators overlook the precept that the Court has discretion to conduct a statutory proceeding as is expedient and appropriate to move the case to a conclusion in a methodical fashion. *See, e.g., In re Tax Sale Held*

---

[22] Rule 3772(c) defines "adversarial proceeding" as

> [a]ny action (1) initiated by the rehabilitator or liquidator against persons other than the insurer, (2) asserting a right or interest afforded by Article V and for which neither Article V nor prior orders of the Court provide an avenue for redress, and (3) that the Court determines shall be governed by Pa. R.A.P. 3783 (adversarial proceedings) as an adversarial proceeding.

PA. R.A.P. 3772(c). Pennsylvania Rules of Appellate Procedure 3771 to 3784 (Summary and Formal Proceedings Against Insurers) apply to all actions in the Commonwealth Court arising under Article V. PA. R.A.P. 3771-3784.

*September 10, 2003 by Tax Claim Bureau of County of Lackawanna*, 859 A.2d 15, 18 (Pa. Cmwlth. 2004) (recognizing that while a trial court is not required to use the Pennsylvania Rules of Civil Procedure in tax sale proceedings, it has discretion to use the Rules of Civil Procedure where appropriate).

Here, the Rehabilitator seeks approval of the Second Amended Plan in this Court's original jurisdiction.[23] Pennsylvania Rule of Civil Procedure 226(b) provides that a trial court may, "[a]t the close of all the evidence … direct a verdict upon the oral or written motion of any party." PA. R.C.P. No. 226(b). This Court has affirmed the entry of a directed verdict following a single-judge bench trial. *See, e.g., Geschwindt v. Wagner*, 1 A.3d 970 (Pa. Cmwlth. 2010) (affirming directed verdict entered by trial court following bench trial). This Court has entered directed verdicts in matters brought within its original jurisdiction. *See, e.g., Pennsylvania Human Relations Commission v. School District of Philadelphia*, 651 A.2d 177 (Pa. Cmwlth. 1993) (granting a school district's motion for a directed verdict by treating it as a motion for a compulsory nonsuit[24] against the Pennsylvania Human Relations Commission on the ground that it had failed to demonstrate that mandatory desegregation measures were feasible).

A directed verdict can be entered in one of two circumstances:

one, the movant is entitled to judgment as a matter of law and/or
two, the evidence is such that no two reasonable minds could

---

[23] 42 Pa. C.S. §761(a)(3) (This Court has "original jurisdiction of all civil actions or proceedings … [a]rising under Article V of the act of May 17, 1921 (P.L. 789, No. 285), known as 'The Insurance Department Act of 1921.'").

[24] While the trial court may, "[*a*]*t the close of all the evidence* … direct a verdict upon the oral or written motion of any party," PA. R.C.P. No. 226 (emphasis added), "the court, on oral motion of the defendant, may enter a nonsuit on any and all causes of action if, *at the close of the plaintiff's case on liability*, the plaintiff has failed to establish a right to relief." PA. R.C.P. No. 230.1(a)(1) (emphasis added).

disagree that the outcome should have been rendered in favor of the movant. With the first, the court reviews the record and concludes that, even with all factual inferences decided adverse to the movant, the law nonetheless requires a verdict in his favor. Whereas with the second, the court reviews the evidentiary record and concludes that the evidence was such that a verdict for the movant was beyond peradventure.

*Hall v. Episcopal Long Term Care*, 54 A.3d 381, 395 (Pa. Super. 2012) (quoting *Campisi v. Acme Markets, Inc.*, 915 A.2d 117, 119 (Pa. Super. 2006)).

The issue raised in the Rehabilitator's motion for a directed verdict is a narrow one: whether the Issue State Rate Approval Option is unlawful as the Intervening Regulators alleged. This is a mixed question of law and fact. The Intervening Regulators assert that the Issue State Rate Approval Option is coercive and provides them with no meaningful review of the rate filings. In their application for reconsideration, the Intervening Regulators contend that the "opt-out" provision cannot be "separated from the larger concern over superseding [s]tate rate approval statutes[.]" Application for Reconsideration at 7.

The Intervening Regulators did not present any evidence to support their challenge to the opt-out provision of the Plan. Cantilo credibly testified that if a state chooses to exercise the Issue State Rate Approval Option, the Rehabilitator will file an application on a seriatim basis to increase rates for policies issued in that state. The Intervening Regulators assert that the requirement that opt-out states act within 60 days and review the rate filings on a seriatim basis is "inconsistent" with "state practices." Application for Reconsideration at 16. However, no evidence in the record supports this claim.

In sum, the Intervening Regulators did not show that the Issue State Rate Approval Option is unconstitutional or otherwise is harmful to their interests.

74

Collectively, those interests involve approximately 2,000 of the 39,000 policyholders affected by the Plan. Ex. RP-22 at 2. This Court properly entered a directed verdict on the Intervening Regulators' objection to the Issue State Rate Approval Option. However, this Court disagrees with the Rehabilitator's proposition that the Intervening Regulators should be dismissed from the rehabilitation proceeding. The Rehabilitator's motion was a narrow one, as was this Court's order granting the motion.

For the foregoing reasons, this Court denies the Intervening Regulators' application for reconsideration.

### 2. Policy Restructuring

NOLHGA and Lapinski raised concerns about the policy restructuring provisions in the Second Amended Plan that impact SHIP's tax liability. The restructuring will address potential taxable income owed by SHIP for cancellation of indebtedness and will bifurcate policy liabilities into funded and unfunded portions. This policy restructuring will not affect coverage for policyholders either now or in the event of a liquidation. Cantilo testified that the restructuring does not affect policyholder choices and will not be performed on a seriatim basis. N.T., 5/17/2021, at 143.

As a result of the concerns raised at the hearing, the Rehabilitator will file a separate application with this Court to address the restructuring and tax issues. N.T., 5/21/2021, at 996. All parties will have an opportunity at that point to raise objections.

### 3. Policyholder Communications

NOLHGA raised concerns regarding policyholder communications, especially with respect to information related to guaranty associations and their

coverage limit. However, NOLHGA's president and fact witness, Peter Gallanis, acknowledged that the Rehabilitator has not refused to engage with NOLHGA regarding its concerns with the Plan or consider NOLHGA's proposed changes. N.T., 5/20/2021, at 686. NOLHGA is free to propose modifications to the Plan and continue to communicate with the Rehabilitator, as NOLHGA has done to date. Gallanis acknowledged that the Rehabilitator is a "capable commissioner" who understands the "important aspects" of the guaranty association system. *Id.* at 680.

### 4. COVID-19 Pandemic

Policyholder James Lapinski raised concerns regarding the impact of COVID-19 on long-term care insurance experience through higher mortality and lower claim incidence. With regard to this issue, Cantilo credibly testified that SHIP has experienced a moderate increase in mortality since the beginning of the pandemic in 2020, which generated a moderate increase in lapses of policies. The pandemic also caused a small increase in morbidity and adversely affected SHIP's expected yield on invested assets. However, the actuarial report prepared by Oliver Wyman shows that the aggregate effects of the pandemic had a moderate impact on SHIP's financial condition and are not material to the implementation of the Second Amended Plan. N.T., 5/17/2021, at 26; N.T., 5/21/2021, at 944.

Lapinski requested that the Second Amended Plan's discussion on COVID-19 be updated with more recent data. Oliver Wyman's actuarial report noted the evolving nature of COVID-19's impact and stated that while certain assumptions "were developed based on claims data predating the effects of COVID-19[,] [the actuarial team] will consider the effects of COVID-19 when [they] update [their] actuarial assumptions in 2021." Ex. RP-16 at 28. As Bodnar testified, upon approval of the Plan, Oliver Wyman will prepare an actuarial memorandum in

76

support of the If Knew Premium rates, similar to one that would ordinarily be submitted to state regulators in a rate increase filing. All parties will have an opportunity at that point to raise objections.

### 5. Funding Gap and SHIP's Balance Sheet

Lapinski questioned the size of SHIP's Funding Gap and the decline of SHIP's capital and surplus and value of its bond holdings as reflected in its balance sheet ending December 31, 2020. In that regard, Cantilo provided extensive testimony on SHIP's hazardous financial condition, the causes of SHIP's insolvency, and the actions taken by the Pennsylvania Insurance Department prior to rehabilitation. The evidence that the Second Amended Plan will substantially reduce the Funding Gap and address SHIP's inequitable rate structure was extensive. As for the decline in the value of SHIP's bond holdings, Cantilo credibly explained that it was due to a decline in yield in the markets in which SHIP's bonds were invested, which added to SHIP's deficit from 2019 to 2020. N.T., 5/21/2021, at 950-51.

### 6. Timing

Finally, Lapinski raised concerns with the timing of the rehabilitation proceeding and stated his desire for SHIP to avoid the lengthy process that Penn Treaty went through prior to liquidation. This Court shares Mr. Lapinski's desire to address SHIP's financial condition swiftly, as does the Rehabilitator. Cantilo testified that the Plan can be implemented quickly: within eight months of approval, the Rehabilitator anticipates receiving policyholder elections, which will enable her to measure the precise impact of Phase One on SHIP's Funding Gap. N.T., 5/18/2021, at 339-40.

## V. Conclusions of Law

1. The Rehabilitator is authorized to "take such action as he deems necessary or expedient to correct the condition or conditions which constituted the grounds for the order of the court to rehabilitate the insurer." Section 516(b) of Article V, 40 P.S. §221.16(b). This includes preparing "a plan for the reorganization, consolidation, conversion, reinsurance, merger or other transformation of the insurer." Section 516(d) of Article V, 40 P.S. §221.16(d).

2. Upon application of the Rehabilitator for approval of a plan of rehabilitation, and after notice and a hearing thereon, "the court may either approve or disapprove the plan proposed, or may modify it and approve it as modified. If it is approved, the rehabilitator shall carry out the plan." Section 516(d) of Article V, 40 P.S. §221.16(d).

3. "[I]t is not the function of the courts to reassess the determinations of fact and public policy made by the Rehabilitator[]" in formulating a plan of rehabilitation. *Mutual Fire II*, 614 A.2d at 1091. "Rather, the involvement of the judicial process is limited to the safeguarding of the plan from any potential abuse of the Rehabilitator's discretion." *Id*.

4. The Rehabilitator's evidence established that the Second Amended Plan will conserve and equitably administer the assets of SHIP in the interest of policyholders, creditors and the public, "with the main purpose being the public good." *Id*. at 1094. The Plan is designed to return SHIP to its pre-receivership status as a run-off company able to meet its obligations as they come due.

5. The Rehabilitator's evidence established that the Second Amended Plan will reduce or eliminate the Funding Gap and eliminate SHIP's inequitable and

discriminatory premium rate structure by offering policyholders meaningful choices to modify their long-term care insurance policies.

6. The Rehabilitator's evidence established that policyholders will fare as well or better under the Second Amended Plan than they would in liquidation. The Plan will provide the benefits of rehabilitation, such as flexibility and the accelerated disposition of claims, which is preferable to the static procedures of liquidation.

7. The Rehabilitator is authorized under Article V to establish actuarially sound premium rates for SHIP policyholders, as needed to rehabilitate SHIP, and without the additional approval of the state insurance department where the policy was initially issued.

8. The Rehabilitator did not abuse her discretion in formulating the Second Amended Plan.

## VI. Conclusion

The Rehabilitator has made a compelling case in support of her Second Amended Plan of Rehabilitation. Indeed, her evidence was not contradicted on any material fact. The Intervening Regulators suggest that they would have exercised their discretion differently, but this is not a basis for the Court to disapprove the Plan.

The opposition of the Intervening Regulators is based upon their belief that the state-by-state regulation of premium rates must be the starting point of any plan to rehabilitate an insolvent insurer. The Court has several responses.

First, the standard for an appropriate premium rate is substantially the same in every state: the premium must be reasonable in relation to the coverage provided in the policy. The evidence presented at the hearing demonstrated that the premium rates used in the four options in Phase One of the Second Amended Plan

79

will satisfy that standard. The Rehabilitator will be tasked with proving satisfaction of that standard in her actuarial memorandum. The Intervening Regulators presented no evidence that she cannot or will not be able to do so.

Second, the Issue State Rate Approval Option preserves the state-by-state procedure for those states that share the concerns of the Intervening Regulators. To the extent a state does not believe that the Rehabilitator, and this Court, should be solely responsible for the task of establishing the seriatim premiums used for the four policyholder options in Phase One, the state can assume responsibility to do so by opting out of this aspect of the Second Amended Plan.

Neither SHIP's policies nor state rate regulatory statutes insulate policyholders from paying a reasonable premium for their coverage. To the contrary, they require the opposite. The Second Amended Plan will advance, not undermine, a reasonable and non-discriminatory premium rate structure, which is the point of rate regulation.

Essentially, the Intervening Regulators exalt the process by which insurance premium rates are set over the rehabilitation of an insolvent insurer whose condition was caused by an inadequate and discriminatory premium structure. As was established by the Rehabilitator's evidence, a rehabilitation of SHIP cannot be accomplished by placing the correction of the company's premium rates into the hands of 46 states.

In all respects, the Second Amended Plan satisfies applicable constitutional requirements. Neither the Full Faith and Credit Clause nor principles of comity require this Court to apply the insurance rate regulatory laws of other states when considering a plan to rehabilitate SHIP, a Pennsylvania domiciled insurer in receivership. Nevertheless, the Seconded Amended Plan, consistent with Article V,

does not evidence "a policy of hostility" to the laws of sister states. Rather, it advances their shared interests in insurance premium rates that are not unfairly discriminatory and reasonable in relation to the benefits provided in the policy.

The Intervening Regulators support a liquidation because it will require guaranty associations to solve SHIP's Funding Gap. However, a liquidation will do nothing to address SHIP's discriminatory premium structure. As NOLHGA's actuary, Matthew Morton, explained, guaranty associations can make rate filings with the state of issue but only on a cohort basis, for the segment of policies covered by the filing guaranty association. As a consequence, Morton opined that in a liquidation, many SHIP policyholders will pay more than the If Knew Premium rate for their coverage while others will pay less. Guaranty associations have no opportunity to propose or implement the seriatim If Knew Premium rate that is central to the Second Amended Plan's correction of the current inadequate and discriminatory premium rate structure. This reason alone supports the Rehabilitator's decision not to liquidate SHIP.

There is nothing unfair about expecting every policyholder to pay an actuarially justified premium for their coverage. That is expected in any insuring system. In the case of SHIP, it will not happen in the absence of the implementation of the Second Amended Plan.

The Rehabilitator has persuaded the Court that rehabilitation is preferred for another reason. A liquidation will place the burden of an actuarially justified premium upon the policyholders of member insurers of the applicable guaranty associations and, ultimately, upon the taxpayers in those states. No one has provided the Court with an explanation as to why, as a matter of policy, the premium burden of SHIP's policyholders should be borne by others.

For these reasons, the Court rejects the arguments of the Intervening Regulators. The Court concludes that the Rehabilitator has appropriately exercised her discretion in devising a plan that will address SHIP's financially hazardous condition while protecting the interests of the policyholders, creditors and public generally.

_____
MARY HANNAH LEAVITT, President Judge Emerita

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

IN RE: Senior Health Insurance      :
Company of Pennsylvania      :
In Rehabilitation      :     No. 1 SHP 2020

# O R D E R

AND NOW this 24th day of August, the Court hereby ORDERS as follows:

1.     The Application for Approval of the Plan of Rehabilitation for Senior Health Insurance Company of Pennsylvania (SHIP) filed by Jessica K. Altman, Insurance Commissioner of the Commonwealth of Pennsylvania, in her capacity as Statutory Rehabilitator of SHIP, is GRANTED. The Second Amended Plan of Rehabilitation, filed on May 3, 2021, is APPROVED, with the exception of Section VI.N of the Plan (relating to suspension of agent and broker commissions).

2.     The Court defers resolution of the Joint Application for Approval of Settlement Agreement, filed by the Rehabilitator and Intervenors ACSIA Long Term Care, Inc., Global Commission Funding LLC, LifeCare Health Insurance Plans, Inc, Senior Commission Funding LLC, Senior Health Care Insurance Services, Ltd., LLP, and United Insurance Group Agency, Inc., pending a hearing to be scheduled by separate order. The Rehabilitator shall continue paying commissions until Phase One of the Second Amended Plan of Rehabilitation is implemented.

3.     The Rehabilitator shall promptly submit an actuarial memorandum in support of the If Knew Premium rates to be used in Phase One of the Second Amended Plan of Rehabilitation to the Pennsylvania Insurance Department for its review and approval.

4.     The Rehabilitator, in her capacity as Insurance Commissioner, shall designate an appropriate deputy insurance commissioner to review the actuarial memorandum submitted to the Insurance Department. Thereafter, the Rehabilitator shall submit the approved actuarial memorandum to the Court.

_____
MARY HANNAH LEAVITT, President Judge Emerita